Marian FISHER et al.

v.

Christian J. VOLZ, Individually and in his
capacity as Captain in the Newark Po-
lice Department of the City of Newark,
New Jersey, et al.,

Appeal of Bernice BASS et al.,
in No. 73–1234.

Appeal of Christian J. VOLZ and John El-
liott Curtis, in No. 73–1235.

Nos. 73–1234, 73–1235.

United States Court of Appeals,
Third Circuit.

Argued Dec. 17, 1973.

Supplementation of Record Completed
March 21, 1974.

Decided April 15, 1974.

As Amended May 3, 1974.

334

Morton Stavis, Peter A. Buchsbaum, Newark, N. J., for appellants.

William H. Walls, William E. James, Salvatore Perillo, Newark, N. J., for appellees.

James R. Zazzali, Zazzali & Zazzali, P. A., Newark, N. J., for defendants-cross-appellants, Volz and Curtis.

Before VAN DUSEN, ALDISERT and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This appeal raises serious questions concerning the right of privacy and the constitutionality of house-to-house police searches without search warrants for a suspect for whom the police have an arrest warrant. The disposition of the appeal involves a balancing of the duty of police officers to search for and arrest those who commit crime and the right of innocent citizens to be secure in the privacy of their homes against unreasonable police invasion.

Plaintiffs, six black citizens of Newark, New Jersey, brought a civil suit for damages under 42 U.S.C. § 1983 [1] alleging that the defendants, all members of the Newark Police Department, violated plaintiffs' civil rights by their roles in three incidents which occurred in the days following an armed bank robbery. As to the first incident, plaintiff Bernice Bass alleged a cause of action against George MacDonald, a detective in the Newark Police Department, for his role in a police entry without a search warrant into her apartment on March 11, 1969. As to the second incident, plaintiffs Marian Fisher and her mother Evangelene Tresvant, Robert Ziemoore and his wife Addie, and Eunice Webbs brought suit against MacDonald and John Curtis, a lieutenant in the police department, for their roles in police entires without search warrants into their respective apartments on March 12, 1969. Additionally, plaintiff Don Clark brought suit against Christian Volz, Captain of the Newark Police Department, for his role in the alleged physical abuse of Clark by the police while they were searching Clark's apartment on March 14, 1969.

A single amended complaint was filed in behalf of all plaintiffs and the cases were tried jointly to a jury commencing November 14, 1972. After a trial of almost three weeks and deliberations of more than seven hours, the jury returned verdicts as follows:

(1) For plaintiff Bass, no damages against defendant MacDonald;

(2) For plaintiffs Fisher, Tresvant, the Ziemoores, and Webbs, no damages against MacDonald and no compensatory damages against Curtis; however, as punitive damages against Curtis, $250 jointly to Fisher and Tresvant, $250 jointly to the Ziemoores, and $250 to Webbs;

(3) For Plaintiff Clark, no compensatory damages against Volz, but $500 in punitive damages.

The trial judge denied a series of motions by both plaintiffs and defendants for judgments notwithstanding the verdict and for new trials. Judgments were entered on the verdicts and all plaintiffs and defendants except plaintiff Clark appeal.

The police actions which are the subject of these suits were a sequel to the March 6, 1969, armed robbery of the Saddle Brook, New Jersey, branch of the Hackensack Trust Company. Four men armed with guns entered the bank, taking $69,000, and in the process of making their getaway wounded a member of the Saddle Brook Police Department.

---

1. Section 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The FBI promptly entered the case and almost immediately obtained arrest warrants for several known participants. The FBI activity was coordinated with the Newark Police Department because the known suspects were from Newark. Three suspects were arrested within a few days, and by March 11 the police and FBI were searching for four additional suspects, Donald Crapps, Donald Shipley, Barry Shipley, and John Allen Bamberger.[2]

Since the parties and the issues differ as to each of the three police actions involved in this case, in the interests of clarity we will treat each action separately even though the actions were tried jointly.

## I. THE BASS SEARCH

The testimony of the police and FBI agents established the following sequence of events. On the morning of March 11, 1969, Agent Genakos, who was in charge of the FBI investigation of the bank robbery, was interviewing the mother of Barry Shipley, the suspect, in the house where he lived. Another agent noticed a phone number on the wall with the name of suspect "Bamberger" written over it. The phone number was checked with the telephone company, and within three or four hours the FBI was informed that the subscriber was a "B. Bass" at 2 Custer Avenue, Newark, New Jersey. Agent Genakos

then checked and discovered that a "B. Bass" had been involved in the release of Barry Shipley on bail after a prior unrelated arrest.

Approximately ten FBI agents and Newark police officers armed with shotguns arrived at 2 Custer Avenue at 4:20 or 4:30 that afternoon. The address turned out to be a six story apartment house. Two agents went to the superintendent's office, inquired about B. Bass, and were given the key to plaintiff's apartment after being told that this was the only B. Bass listed in the building.

A party of five or six officers ascended to the apartment, including Detective MacDonald, a plainclothesman on the Bandit Squad of the Newark Police Department. After knocking on the door and receiving no answer, the officers gained entry by opening the door with the key. They testified that they spent between half a minute and two minutes searching the apartment for the suspects,[3] and then left without finding anybody.[4]

When Mrs. Bass, who was living alone in the apartment, returned from work after 5:00 P.M., she was told by neighbors of the police entry. This was confirmed when she called the Newark police and the FBI office. Mrs. Bass, who did not allege that there was any physical damage to her apartment, testified that she was embarrassed and humiliated by the incident.[5]

2. All four were ultimately arrested. In United States v. Bamberger, 456 F.2d 1119 (3d Cir. 1972), cert. denied, 413 U.S. 919, 93 S.Ct. 3067, 37 L.Ed.2d 1040 (1973), this court affirmed the convictions of three defendants and reversed as to one defendant whom we ordered discharged from custody. In United States v. Bamberger, Appeal of Reed, 460 F.2d 1277 (3d Cir. 1972), cert. denied, 413 U.S. 919, 93 S.Ct. 3068, 37 L.Ed.2d 1041 (1973), we affirmed the conviction of the driver of the getaway car.

3. Plaintiff Bass testified, however, that she believed Agent Genakos later told her that the officers had been in her apartment for ten or fifteen minutes.

4. As it turned out, the officers had the wrong apartment in the building. The per-

son listed with the phone company as B. Bass living at 2 Custer Avenue was registered with the building superintendent as Betty McCall.

By coincidence, about a half hour after the agents left the Bass apartment, Donald Crapps and Donald Shipley, two suspects in the robbery, were arrested in another apartment about a block away.

5. She testified that the New Jersey Afro-American, a weekly black newspaper, had a banner headline and also subsequent stories concerning the raid on her apartment. As a federal employee she was required to report the incident to her superiors, who reported it to the regional officer, but each apparently understood that it was a mistake. She eventually broke her lease in October and moved.

There was testimony that at the time of the entry into the Bass apartment there were arrest warrants outstanding for the remaining suspects in the robbery. It is undisputed, however, that the police did not have a search warrant either for the apartment building at 2 Custer Avenue or for the individual Bass apartment. Agent Genakos testified that he made no effort to obtain a search warrant, apparently because he believed it would have taken too long.[6] Detective MacDonald testified that he simply went along "for assistance" after being told by the FBI that "Donald Shipley was in that building, in an apartment." MacDonald who had been on the Newark police force for twenty-four years, testified that he had never secured a search warrant even though he had entered "thousands" of apartments. He acknowledged that he made no effort to obtain a search warrant for this entry. Agent Genakos on cross-examination agreed with the statement that "at [the time of entry] you had no indication of [the presence of any of the suspects in the apartment] whatever."

The jury, as noted, returned a verdict of no cause of action by plaintiff Bass as against MacDonald. The jury had been instructed, in answer to a written question, that it could find a cause of action for plaintiff Bass only if it found a violation of one of her constitutional rights. The only issue raised on the Bass appeal concerns the standard for determining whether her fourth amendment rights had been violated by the entry into her apartment. Plaintiff Bass contends, in the alternative, that the charge given by the court was improper,[7] or that she was entitled to a directed verdict as a matter of law on the issue of liability.

The tenor of the court's charge to the jury on the issue of warrantless searches, to which counsel for plaintiffs made timely objections, was as follows: Warrantless searches are per se unreasonable under the fourth amendment unless the police can meet the "heavy burden" of showing that "exigent circumstances or urgent need" gave them no time to procure a warrant; the need must arise from "an immediate major crisis in the performance of duty."

Therefore, in determining whether there were exigent circumstances and whether the defendants were entitled to search the plaintiffs' homes in the absence of search warrants *you, the jury, may consider a number of factors that are material.* [Emphasis supplied.]

The charge listed eleven factors which the jury could consider in assessing whether exigent circumstances were present, such as the dangerousness of the suspect, the nature of the offense involved, the time and manner of entry into the premises, and the opportunity for obtaining a warrant.[8] Included in the list were the factors:

(a) Was there more than a minimum of probable cause to believe that the

---

6. He testified that on March 7 it had taken him five hours to get a search warrant related to the same bank robbery.

7. All parties agree that the issue of the constitutionality of the entry, as well as the constitutionality of the other entries involved in this appeal, were properly jury questions. *See* Pierson v. Ray, 386 U.S. 547, 557, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); Giordano v. Lee, 434 F.2d 1227, 1230 (8th Cir. 1970), cert. denied, 403 U.S. 931, 91 S.Ct. 2250, 29 L.Ed.2d 709 (1971); Anderson v. Haas, 341 F.2d 497 (3d Cir. 1965).

8. The relevant portion of the charge was as follows:

▆▆▆▆

Therefore, in determining whether there were exigent circumstances and whether the defendants were entitled to search the plaintiffs' homes in the absence of search warrants you, the jury, may consider a number of factors that are material. [1] One factor is whether or not a grave offense is involved, particularly one that is a crime of violence. [2] Another factor is whether or not the suspect was reasonably believed to be armed. Was he in fact a dangerous suspect?

▆ It has been stated that delay in arrest of an armed felon may well increase danger to the community or to the officers at time of arrest and that this factor, as the others

suspect committed the crime involved?

and

(b) Was there strong reason to believe that the suspect was in the premises being entered?

The court went on to say that "the defendant must prove by a preponderance of the evidence that the circumstances at that time were such as to justify the action which they took."

The charge clearly permitted the jury to return a verdict against plaintiff Bass if it found that the existence of some of the factors enumerated by the trial court created "exigent circumstances" which justified the entry into her apartment, even though there might not have been probable cause to enter. Bass contends that the requirement of probable cause to believe that the suspect is in the apartment is an indispensable, *independent* requirement notwithstanding the presence of exigent circumstances. We agree and reverse as to plaintiff Bass.

## A. The Constitutional Requirement of Probable Cause

 Even if exigent circumstances exist, police officers without a valid search warrant may not constitutionally enter the home of a private individual to search for another person, though he be named in a valid arrest warrant in their possession, absent probable cause to believe that the named suspect is present within at the time. The police testimony in this case established the existence of the majority of factors which the court instructed the jury were relevant to a finding of "exigent circumstances."[9] It is, therefore, quite possible that the jury relied upon these factors to uphold the constitutionality of the search even though the jury did not believe (or would not have believed if they had considered the question) that the police had probable cause to enter the apartment. We therefore do not believe the error in the charge was harmless error, and we must reverse the trial judge's denial of a new trial to plaintiff Bass.

The fourth amendment to the Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Supreme Court has recognized that the physical invasion of the home is "the chief evil" to which the fourth

which I am about to relate to you and have related, bears materially on the justification for a warrantless entry.

 Another factor. Was there more than a minimum of probable cause to believe that the suspect committed the crime involved?

 Another factor. Was there strong reason to believe that the suspect was in the premises being entered?

 Another factor. Was there a likelihood that the suspect would escape if not swiftly apprehended, since the Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others?

 Another factor. Was the entry, although not consented to, if in fact you find it was not consented to, made peaceably?

 Another factor to be taken into account has to do with the time of entry.

 Another factor has to do with what delay if any, would have been involved in the obtaining of a warrant.

 Another factor has to do with whether or not the defendants announced the purpose and authority of their planned entry before breaking into the plaintiffs' homes.

 And . . . another factor is the availability or lack of availability of a magistrate or judge to whom the defendants could have applied and the time or opportunity for such application.

9. See footnote 8 for the enumerated factors. The testimony, if believed, established factors [1], [2], [3], [7], [8], and [11]. There was no evidence about [4] and [6]; [5] and [9] are in dispute; and [10] is inapplicable since no one was home in the apartment.

amendment is historically directed. United States v. United States District Court, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). Although crime has become an increasingly serious problem in our affluent society,

> [t]he right of officers to thrust themselves into a home is also a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.

Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948).

Of course, the Supreme Court has recognized exceptions to the requirement of a search warrant, but the Court has been quite clear that these exceptions, based upon "exigent circumstances," do not dispense with the requirement of probable cause. As stated in Chambers v. Maroney, 399 U.S. 42, 51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419 (1970),

> In enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, *the Court has insisted upon probable cause as a minimum requirement for a reasonable search permitted by the Constitution.* As a general rule, it has also required the judgment of a magistrate on the probable-cause issue and the issuance of a warrant before a search is made. *Only in exigent circumstances* will the judgment of the police as to probable cause serve as a sufficient authorization for a search. [Emphasis supplied.]

The Court has applied the same rule when specifically considering warrantless entries into a private dwelling.[10] In McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948), the Court exemplified as an exception to the warrant requirement the situation where officers "passing by on the street, hear a shot and a cry for help and demand entrance [to a dwelling] in the name of the law." 335 U.S. at 454, 69 S.Ct. at 192. In Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1966), two cab drivers at the scene of an armed robbery followed the robber to a private house and notified their dispatcher by radio. The police were at the scene within five minutes. The Court held their warrantless entry into the house constitutional because

> [s]peed here was essential, and only a thorough search of the house for persons and weapons could have *insured that Hayden was the only man present* and that the police had control of all weapons which could be used against them or to effect an escape. [Emphasis supplied.]

387 U.S. at 299, 87 S.Ct. at 1646. In each of these exigent situations it was obvious that the police also had probable cause to make an entry.

We recently had occasion in this circuit to state that probable cause is an indispensable element for a warrantless search of a dwelling even in the presence of "exigent circumstances." In United States v. Rubin, 474 F.2d 262 (3d Cir. 1973), we upheld the warrantless search of a home where government agents had probable cause to believe that a large quantity of contraband narcotics might be removed or destroyed unless they acted quickly. We stated, however:

> Probable cause to believe contraband is present is necessary to justify a warrantless search, but it alone is not sufficient. Probable cause must exist

---

10. *See also* Vale v. Louisiana, 399 U.S. 30, 34, 90 S.Ct. 1969, 1972, 26 L.Ed.2d 409 (1970):

[O]ur past decisions make clear that only in "a few specifically established and well-delineated" situations . . . may a warrant less search of a dwelling withstand constitutional scrutiny, even though the authorities have probable cause to conduct it. The burden rests on the State to show the existence of such an exceptional situation.

to support *any* search; the role of the warrant-issuing magistrate is to determine whether probable cause exists. 474 F.2d at 268. We then held that in addition to probable cause, there must be exigent circumstances to justify a warrantless search.[11] *Id.*

Although this court has not considered the precise issue presently before us, involving entry into a third party dwelling in reliance on only a valid *arrest* warrant, those circuits which have considered the question have uniformly held that such entry is constitutional only when the police have probable cause to believe that the suspect is within.

In Lankford v. Gelston, 364 F.2d 197 (4th Cir. 1966) (en banc), several black families in Baltimore brought a § 1983 class action requesting that the city police be enjoined from continuing the practice of "turn-ups." The practice involved sending a group of heavily armed men to surround and enter a house in search of two armed robbers who had seriously wounded a policeman. Within slightly over two weeks of the robbery, over 300 such raids had been made, mostly on the basis of anonymous tips. The court, stating that money damages would not be sufficient to repair the injury suffered by the victims, unanimously directed the entry of a decree

> enjoining the Police Department from conducting a search of any private house to effect the arrest of any person not known to reside therein, whether with or without an arrest warrant, where the belief that the person is on the premises is based only on an anonymous tip and *hence without probable cause.* [Emphasis supplied.]

364 F.2d at 206. The court emphasized that

> All members of the Police Department, from the Commissioner down to

the raw recruit, are expected to be familiar with the principle that if the police intend to conduct a search of a man's home for a suspect, they must at least have probable cause to believe that he is on the premises. The doctrine is not subtle; it touches the very heart of law enforcement practices, and has found expression in numerous judicial opinions.

364 F.2d at 202–203. The court declined to reach the broader question of whether, absent exceptional circumstances, police with an arrest warrant should be required to also obtain a search warrant before entering a third party home, or whether the arrest warrant provides justification for the police to make their own determination of probable cause subject to later judicial review. 364 F.2d at 205–206.

In United States v. McKinney, 379 F.2d 259 (6th Cir. 1967), the court in reviewing a criminal conviction held that the police may execute a valid arrest warrant on the premises of a third party, without the need for a search warrant, if the police did "reasonably believe" that the suspect could be found on the premises searched. The court, apparently considered "reasonable belief" to be synonymous with "probable cause." In determining that the police had "reasonable belief" that the suspect was within, the court relied on McCray v. State of Illinois, 386 U.S. 300, 87 S.Ct. 1056, 18 L.Ed.2d 62 (1967), a "probable cause" case.

The same issue was presented in United States v. Brown, 151 U.S.App.D.C. 365, 467 F.2d 419 (1972). In an opinion by Mr. Justice Clark, the court stated that

> The arrest warrant issued under Rule 4(c) [Fed.R.Crim.Proc.] provides authority to enter any premises for the purpose of enforcing the warrant, *if*

11. *See also* United States v. Valen, 479 F.2d 467 (3d Cir. 1973); United States v. Menke, 468 F.2d 20 (3d Cir. 1972) (warrantless search of automobile); United States v. Davis, 461 F.2d 1026 (3d Cir. 1972) (warrantless entry into suspect's home to make arrest requires probable cause to believe he committed the offense). *Cf.* United States v. Butenko, 494 F.2d 593 (3d Cir. 1974) (en banc) (no probable cause requirement for foreign intelligence wiretaps).

*the officer has probable cause to believe that the subject is located therein.* [Emphasis supplied.]

467 F.2d at 424. The court held that on the facts before it the police did have probable cause to make the entry.[12]

In charging the jury that the presence or absence of probable cause was only one of several factors which were to be taken into account in determining the propriety of the police search of the Bass apartment, the district court expressly relied upon Dorman v. United States, 140 U.S.App.D.C. 313, 435 F.2d 385 (1970) (en banc).[13] *Dorman*, however, preceded the *Brown* decision by the same circuit. *Dorman* held that police who had *neither* a search warrant nor an arrest warrant could enter the home of a suspected armed robber for the purpose of arresting him, if the circumstances were reasonable in light of several factors, including "strong reason to believe that the suspect is in the premises being entered."

We do not believe *Dorman* controls the instant case, however, and we therefore need not express any view as to whether we would follow *Dorman* on its facts.[14] *Dorman* involved the very special circumstances where the police entered the home of the suspect himself, not the homes of one or more third parties. In such case, the court held, exigent circumstances justified the entry even in the absence of an independent finding that the police had probable cause to believe the suspect was at home.

We recognize the need for police officers to move quickly and firmly in the apprehension of suspects who in this era of technology enjoy extraordinary resources for rapid mobility and instantaneous communication. The effective enforcement of the law, however, can only

be maintained by a respect for the law. High on the list of constitutional rights is the right of an innocent citizen to be free from unreasonable intrusion into the privacy of his home. A warrant for the arrest of a suspect may indicate that the police officer has probable cause to believe the suspect committed a crime; it affords no basis to believe that the suspect is in some stranger's home. Permitting reliance by the officer solely on exigent circumstances offers too many opportunities for abuse, provides little comfort to a citizen peacefully in his home, and affords insufficient protection against invasions of his privacy. A requirement that the officer must also have probable cause to believe that the suspect is in the dwelling will not unduly restrict the effectiveness of police action but will reduce the obvious risks of abuse. It offers police considerable latitude but also requires a necessary amount of restraint. It should enable the police to act reasonably but not oppressively, promptly but not recklessly, lawfully but not offensively.

> Law observance by the police cannot be divorced from law enforcement. When official conduct feeds a sense of injustice, raises barriers between the department and segments of the community, and breeds disrespect for the law, the difficulties of law enforcement are multiplied. [Footnote omitted.]

Lankford v. Gelston, 364 F.2d at 204.

■ We therefore hold that police officers may not constitutionally enter the home of an innocent citizen in search of a suspected offender for whom they have a valid arrest warrant, even under exigent circumstances, unless they also have probable cause to believe that the

12. The court in *Brown* believed that probable cause was sufficient to constitutionally permit an entry into a private home to enforce an arrest warrant. Although it made no explicit reference to "exigent circumstances," its discussion reveals that such circumstances were considered in determining the existence of probable cause.

13. The factors enumerated in the charge closely parallel those listed in *Dorman*. Compare note 8 *supra* with *Dorman*, 435 F. 2d at 392–393.

14. *See* Coolidge v. New Hampshire, 403 U.S. 443, 481, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), where the question was also left open.

suspect will be found on the premises.[15, 15a]

## B. Imposition of Liability as a Matter of Law

Plaintiff Bass, however, would have us go further and hold that the trial judge should impose liability upon the defendants as a matter of law. First, she contends, the fourth amendment requires that even if the police have a valid arrest warrant and probable cause to believe that the suspect is in a private dwelling, they may not enter the private dwelling of a third party without consent unless they first procure a search warrant for the dwelling.[16] She argues that unless this "dual warrant" requirement is imposed, the arrest warrant becomes in effect a "general warrant."

It is true that a primary purpose of the fourth amendment was to eliminate the abuses inherent in the general warrants issued by the British Crown.[17] See Stanford v. Texas, 379 U.S. 476, 482–486, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965); United States v. Gervato, 474 F.2d 40, 43 (3d Cir.), cert. denied 414 U.S. 864, 94 S.Ct. 39, 38 L.Ed.2d 84 (1973). These warrants

typically authorized the arrest and search of the premises of all persons connected with the publication of a particular libel, or the arrest and seizure of all the papers of a named per-

---

15. We do not discuss at this point possible defenses of a police officer predicated on good faith. We believe that any question of good faith in this case was one for the jury. No charge on such a defense was requested and none was given. Under proper instructions, the jury might have found both a constitutional violation and a lack of good faith. We therefore do not believe that the possible existence of such a defense permits us to affirm the verdict for MacDonald. See also note 27 infra.

15a. We have carefully examined the record and we believe, contrary to the dissent, that this issue upon which we reverse was sufficiently raised and preserved by the plaintiffs in the district court. See Pierro v. Carnegie-Illinois Steel Corp., 186 F.2d 75, 78 (3d Cir. 1950).

(1) The question of the applicable constitutional standards governing the police entry was the subject of extensive discussions between counsel and the trial court. The district court was aware of United States v. McKinney, supra, and Lankford v. Gelston, supra.

(2) Plaintiffs moved at trial for a finding that as a matter of law the police lacked probable cause to make the entry. Implicit in that motion was the contention that absent probable cause the entry was unconstitutional. This contention was preserved throughout the trial, and is also raised on appeal.

(3) Plaintiffs' primary contention at trial was that the police were liable as a matter of law because they lacked search warrants. The district court recognized that this contention raised the question of whether probable cause (a requirement for a search war-

rant) was required in addition to exigent circumstances in order to justify the entry. The court rejected the contention, in part because it felt that the entries might be justified even absent the probable cause which would be necessary for a search warrant.

(4) Plaintiffs' reserve position was that even if circumstances might justify a police entry without a search warrant, each of the factors listed in their request to charge (quoted by the dissent), including "strong reason to believe that [the suspect] is on the premises," must be present. The dissent considers the Dorman reference in the point to charge as an abandonment of anything but a request for a charge literally following Dorman. This, however, is inconsistent with plaintiffs' position throughout the trial, as well as with the specific request to charge.

16. She distinguishes McKinney and Brown by arguing that both cases involved entries into dwellings whose occupants the police believed had some nexus with the suspect named in the arrest warrant, friends in McKinney and the fugitive's "number one girl friend" in Brown. Neither court relied upon this factor, however, in determining that the police could enter the dwelling if they had probable cause to believe the suspect was within. While the factor may properly go to the question of whether the police had probable cause, it does not go to the question of the need for a search warrant when the police do have probable cause.

17. The landmark English cases holding these warrants improper were Wilkes v. Wood, 19 How.St.Tr. 1153 (1763), and Entick v. Carrington, 19 How.St.Tr. 1029 (1765).

son thought to be connected with a libel.

Stanford v. Texas, 379 U.S. at 482–483, 85 S.Ct. at 510.

We do not believe, however, that we are transforming an arrest warrant into a "general warrant" when we hold that the police under exigent circumstances may dispense with a search warrant when they have probable cause to believe that the suspect named in the arrest warrant is in a particular third party dwelling. The arrest warrant names a specific person. It therefore avoids the abuse inherent in the first type of general warrant mentioned by the Supreme Court in *Stanford, supra*. Furthermore, since the probable cause standard for entry into the dwelling is the same whether or not the police are required to obtain a search warrant in addition to the arrest warrant, the abuse inherent in the second type of general warrant mentioned in *Stanford* is avoided. Although the police decide in the first instance whether or not they have probable cause to believe the suspect is within a particular dwelling, this determination is of course subject to judicial review in the event a civil proceeding is subsequently brought against the police, as in the present case. The vice of a general warrant was that it authorized wide and sweeping searches for suspects or evidence. Our holding, on the other hand, does not expand the *underlying situa-*tions in which entry is permissible; it only leaves the initial *determination* of the propriety of the entry to the police.

We finally consider Bass' second contention that she is entitled to judgment as a matter of law on the issue of liability. Even if the police would have been justified in entering her apartment had they had probable cause to believe a suspect was within, she argues, on the facts of this case we should determine that as a matter of law the police lacked such probable cause.

■ We must reject this contention. On the basis of the telephone number which the police traced (although mistakenly) to her apartment, and the "B. Bass" who had previously been involved in bailing out Barry Shipley, the jury might justifiably have found that the police did in fact have probable cause to enter the apartment. While we do not intimate our own view of the matter, we note that the facts of this case are at least as strong as those upon which the *McKinney* and *Brown* courts relied to find probable cause.[18]

## II. THE GOODWIN AVENUE INCIDENTS

Police and FBI testimony was as follows as to the March 12 searches at 7 Goodwin Avenue. Shortly before 11:00 A.M. that day, MacDonald received a telephone call from an informer with whom he was acquainted[19] telling him

---

18. In *McKinney*, the police relied upon a month-old tip by an acquaintance of the suspect that the suspect had "spent some time in or around" the apartment, and a tip from an undisclosed source of undisclosed reliability about noon on the day of the entry that the suspect was then in the apartment. The entry was made "later that afternoon." 379 F.2d at 260–261, 263–264.

In *Brown*, the security guard in an apartment building had identified a photograph of the suspect as being a party "that he sometimes observed frequent the building" in company with the female occupant of an apartment in the building. The police, who were staking out the building, saw two unidentified men enter the building at 11:00 P. M. the next day. Shortly thereafter they saw a light go on in a window "in the vicini-ty" of the apartment window in which they were interested. The police waited until 5:20 A.M. the next morning before going up to the apartment, knocking on the door, and waiting several minutes for the door to be opened. 467 F.2d at 420–424.

19. MacDonald testified on direct examination that the information given him by this informer had "checked out" on each of MacDonald's six or seven prior dealings with the informer. He admitted on cross-examination, however, that he meant that he *believed* the information to be correct at the time the informer gave it, even though the information "sometimes" proved not to be true as of the time the police attempted to confirm it.

that Bamberger, one of the robbery suspects, had just entered an apartment building at 7 Goodwin Avenue, Newark. MacDonald immediately notified Lieutenant Curtis, Commander of the Tactical Force of the Newark Police Department. In response to Curtis' radio call to his men and his notification of the FBI, between fifteen and twenty officers (about half Newark police and half FBI agents) were assembled in a nearby station house.

Curtis, who conducted a short meeting at the station house, testified that he felt there was insufficient time to secure a search warrant,[20] although he admitted on cross-examination that he had never procured a search warrant during his 26 years on the force. Other officers who were present at the meeting confirmed that there was no discussion concerning search warrants.

Between 30 and 40 minutes elapsed from the time MacDonald received the call from the informer until the assembled police armed with shotguns arrived at 7 Goodwin Avenue.[21] Curtis testified that he would characterize the neighborhood as a slum area; there was other testimony that the neighborhood was a lower class area and about ninety percent black. Curtis, who was in command of the operation, ordered about half the men, including MacDonald, to remain outside. MacDonald at no time entered the building. Curtis, according to his own testimony, had at the station house ordered the entry and search of every apartment, with entry gained by force if necessary.

Curtis himself, along with several other police and FBI agents, went to the rear first floor apartment, which apparently had a separate entrance onto a porch. Robert Ziemoore and his wife, Addie, the occupants of the apartment, were not at home. One of the FBI agents forced the door open in Curtis' presence. Curtis and the others who entered the apartment testified that they searched for the suspects for two to four minutes. Not finding anyone, they left and tied the door shut with a string or rope.

Meanwhile, another group of officers ascended to the second floor of the building. Eunice Webbs and her two children lived in one apartment on this floor, and Marian Fisher and her mother, Evangelene Tresvant, lived in the other apartment. No one was home in either apartment. The police forced open the doors and quickly searched the apartments. The police testified that they made some effort to lock the doors when they left but the testimony was ambiguous as to whether they were able to do so.

The entire building search lasted ten or fifteen minutes, after which the police reassembled and left without finding any of the suspects. They made no attempt to notify any of the apartments' occupants of the entry; despite the broken door locks, they left no police guard at the building to protect the contents of the apartments. Although most of the officers testified that there were approximately fifteen or twenty civilians watching the police activity, one officer testified that there were approximately a hundred standing around as the police left. Each police and FBI officer called to testify denied that he had personally disturbed the contents of, or had taken anything from, any apartment; each denied seeing any other officer or agent engage in either activity.

20. There was conflicting testimony as to how long it would have taken to get a search warrant. Curtis testified he thought it would take four to five hours, and this was supported by the FBI testimony that it had taken them five hours to get a federal warrant several days previously. On the other hand, Judge Hazlewood, a judge on the Newark Municipal Court who had been sitting on March 12, testified that at that time, in emergency circumstances, a warrant might have been issued in "ten, fifteen, [or] twenty minutes."

21. A squad car ordered to keep watch over the building could have reached the building within two minutes of the order, but no such order was given.

Mrs. Ziemoore testified that she returned to her apartment as the police were leaving. Her front door was lying on the floor, her dog was missing, the pillows and chairs were overturned in the kitchen, the bedroom closet door was open and the contents of the closet scattered over the floor, drawers were pulled open, and the mattress was upturned. She later discovered that a ring and wristwatch worth $195 together had disappeared. Her testimony was substantiated generally by her husband.

Bryant Webbs, age 14, testified that as he was passing by the building he saw the police activity. Immediately after the police left, he went upstairs to the apartment of his sister, Eunice. He testified that he waited there for his sister because

> [t]he house was all tore apart and everything and I didn't want nobody else to come in there since the doors was all, you know—the doors downstairs was opened plus all the rest of the doors was opened . . .

He testified that doors to individual apartments were wide open. When he got to the apartment,

> [d]rawers was pulled out. The mattress and bed was, you know, off the bed. The sofa; somebody had took the pillows off the sofa and everything. Everything was just scattered around like somebody had been, you know, burglar or something.

Eunice Webbs similarly testified to conditions in her apartment when she returned home. Furthermore, she stated that the door was "bust in" and the lock had been knocked completely off on the floor. She later noticed that $95 in cash was gone from under the mattress.

Marian Fisher testified that when she reached home the door to her apartment was open and the lock knocked off. The apartment was "all torn up," with drawers open, and the contents of a closet and the kitchen pots and pans scattered over the floor. She later discovered that $115 in cash, as well as her wedding band and a pearl ring, were missing.

In charging the jury as to the law relating to the causes of action by these plaintiffs against Curtis and Mac-Donald, the court first stated that the jury could hold defendants liable if they acted under color of law, and if the constitutional rights of plaintiffs were violated under the *Dorman* standards to which we have alluded in our discussion as to plaintiff Bass. The defendant in question must also have either personally participated in the violation, directed the infliction of injury, or had supervisory control as a superior officer over others who inflicted injury to the plaintiffs. If these conditions were met, the jury was instructed, it could award plaintiffs compensatory damages for loss of property, lost wages, and/or humiliation and emotional distress. Furthermore, if the jury found a constitutional violation accompanied by malice or wantonness, and if the jury also awarded compensatory damages, then the jury could award punitive damages in an amount calculated to deter future unconstitutional conduct.

The court also charged that if the jury found no violation of plaintiffs' constitutional rights from the entries into their apartments, but did find gross and culpable negligence showing a flagrant disregard for property by a defendant, then the jury could award compensatory damages, and if it did award compensatory damages, it could also award punitive damages.[22]

22. *See* Jenkins v. Averett, 424 F.2d 1228, 1232 (4th Cir. 1970). The jury was also charged that if it found simple negligence on the part of the defendants, it could award compensatory damages for lost property and wages if such losses were foreseeable consequences of the negligence. However, no punitive damages were to be awarded for simple negligence.

Since the jury did award punitive damages against Curtis, and since we reject the contention that the jury must have been confused between the meaning of compensatory and punitive damages, the jury could not have found Curtis liable for simple negligence. We therefore need not consider the propriety of this portion of the charge.

The jury returned its verdict of no cause of action as against MacDonald, and punitive damages as against Curtis in the amounts of $250 jointly to Fisher and Tresvant, $250 jointly to the Ziemoores, and $250 to Webbs. The verdict against Curtis was clearly inconsistent with the court's instructions, which had expressly stated that the jury could award punitive damages to a plaintiff only if it also awarded compensatory damages to the same plaintiff.

The court as well as counsel recognized the inconsistency, and before the jury was finally dismissed, counsel discovered the case of Basista v. Weir, 340 F.2d 74, 87–88 (3d Cir. 1965), which makes clear that puntive damages may indeed be awarded without also awarding compensatory damages. The court thereupon reconvened the jury, explained that his original instructions were incorrect on this point, and asked if they had intended to award punitive damages without compensatory damages. After a few moments' deliberation, the jury returned and answered in the affirmative. The court entered judgment in accordance with the verdict.

■ We first consider plaintiffs' allegations of error.[23] Plaintiffs contend that they were entitled to a directed verdict on the issue of liability on the ground that the searches of their apartments were unconstitutional as a matter of law. They contend further that the court's failure to make this ruling confused the jury and created the likelihood that the jury verdict was a result of a compromise on the issues of liability and damages. They request a new trial limited to the issue of compensatory damages. We need not consider whether the court erred by failing to give plaintiffs a directed verdict on the issue of liability, however,[24] because we believe any error in this regard was made harmless by the jury verdict holding Curtis liable for punitive damages. We refuse to speculate on the manner in which the jury reached its verdict, and we assume the jury followed the instructions which required it to find liability before it could consider the question of damages.[25]

23. These plaintiffs properly do not rely upon the error in the charge relating to the proper fourth amendment standards which we considered as to plaintiff Bass. The jury's award of punitive damages against defendant Curtis must have been predicated upon either a finding of a constitutional violation or of gross and culpable negligence in the searches of plaintiffs' apartments. Even if the incorrect charge forced the jury to rely upon gross negligence instead of a constitutional violation, we do not see how this would have affected the award of compensatory damages. Moreover, plaintiffs do not contend that the issue of punitive damages should be retried because the award might have been higher under a proper charge concerning fourth amendment standards.

As to defendant MacDonald, since the jury found Curtis liable for the entries into all three apartments, the jury could only have held MacDonald not liable because he was not present in a supervisory capacity and did not personally enter any apartments. The error in the charge on fourth amendment standards was harmless as to him as against these plaintiffs.

24. We note that the police had far less reason to believe that the suspects were in any one of the apartments entered at 7 Goodwin Avenue than they did as to the Bass apartment at 2 Custer Avenue. In the Bass incident, a telephone number seemingly connected to one of the suspects was traced directly (although, as it turned out, mistakenly) to the apartment which was searched. Here, the police were relying solely upon a tip from an undisclosed informer of admittedly uncertain reliability, see note 19 supra. Compare Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Furthermore, the informer had given no indication as to which of the half dozen apartments in the building the suspect had entered.

25. Plaintiffs also contend that the jury's failure to award compensatory damages was against the clear weight of the evidence, once the jury found, as evidenced by its award of punitive damages, that plaintiffs were entitled to recover compensatory damages.

However, this contention overlooks the possibility, admitted elsewhere by plaintiffs, that "It is possible, of course, that the jury honestly believed that there was in fact no compensatory loss." The jury may well have found a constitutional violation or gross negligence by Curtis, but simultaneously disbelieved plaintiffs' claims of mone-

We turn now to the contentions of defendant Curtis as to the reasons the award of punitive damages as against him should be reversed. Curtis contends first that the award of punitive damages, at least in favor of Fisher, Tresvant, and Webbs, was against the weight of the evidence because he "did not personally direct an invasion of plaintiffs' rights," and did not personally enter their apartments.

█ We reject this contention. We begin with the proposition that although punitive damages are not a favorite in law and are to be allowed only within narrow limits,

> [t]he allowance of such damages inherently involves an evaluation of the nature of the conduct in question, the wisdom of some form of pecuniary punishment, and the advisability of a deterrent. Therefore, the infliction of such damages, and the amount thereof when inflicted, are of necessity within the discretion of the trier of fact.

Lee v. Southern Home Sites Corporation, 429 F.2d 290, 294 (5th Cir. 1970).[26]

█ Curtis admitted that, giving no thought to obtaining a search warrant, he ordered every door opened by force if necessary and the apartments searched. The jury might reasonably have concluded that Curtis was simply unconcerned with the constitutional rights of the plaintiffs, and that his order to his subordinates also indicated a wanton disregard for their rights. This is especially possible in light of the racial composition of the neighborhood and in light of Curtis' admission that in 26 years on the force he had never obtained a search warrant. Furthermore, the jury might have found that when Curtis left the scene with the other officers, they left

the doors to the apartments wide open. Since one officer testified that about a hundred civilians were standing on the street as the police left the scene, the jury might have concluded that Curtis' failure to post a police guard around the apartments to prevent looting by the civilians evidenced a gross disregard for the plaintiffs' property.

Curtis is not being held liable for punitive damages under the doctrine of "respondent superior," as he seems to contend, but rather for his personal action in directing the forcible entries into the apartments and failing to take minimal precautions to protect plaintiffs' property. On the facts of the case, we believe the jury verdict against him for punitive damages must be sustained.

Curtis next contends that the punitive damage award should be reversed because the jury "obviously intended to award compensatory damages," but "because of mistake or confusion" in their understanding of the two types of damages mistakenly awarded punitive damages. He points especially to the jury's award of punitive damages without compensatory damages in contradiction to the court's initial charge.

█ We must reject this contention. We attach considerable weight to the jury's flat award of $250 as against Curtis for each of the forced entries at 7 Goodwin Avenue. Had the jury intended the awards to be compensatory, it would have returned a verdict reflecting the varying amounts of losses alleged as to each apartment. The award of a fixed amount for the entry into each apartment strongly indicates that the jury was not attempting to compensate plaintiffs for actual losses, but rather to punish the defendant and deter similar

---

tary losses. *Cf.* Rhoades, Inc. v. United Air Lines, Inc., 340 F.2d 481, 485–486 (3d Cir. 1965).

We also note that all parties agreed that the jury could not return compensatory damages for the Ziemoore's lost dog or broken door, since there was no evidence as to the amount of the loss. The jury was instructed accordingly.

**26.** *See also* Donahue v. Staunton, 471 F.2d 475, 482 (7th Cir. 1972), cert. denied, 410 U.S. 955, 93 S.Ct. 1419, 35 L.Ed.2d 687 (1973); Caperci v. Huntoon, 397 F.2d 799 (1st Cir.), cert. denied, 393 U.S. 940, 89 S. Ct. 299, 21 L.Ed.2d 276 (1968).

misconduct. Had there been any doubt, it was resolved when the jury responded affirmatively to the court's query on whether it had indeed intended to award punitive damages without compensatory damages.

■ Defendant Curtis additionally contends, for the first time on appeal, that he was entitled to an instruction that good faith in his ordering the entries into plaintiffs' apartments would constitute a defense to the § 1983 action. We need not consider whether such a charge would have been required had it been timely requested, however,[27] since we believe that failure to make such timely request bars the assignment of error on appeal. Fed.R.Civ.Proc. 51. Porter v. American Export Lines, 387 F.2d 409 (3d Cir. 1968); Stilwell v. Hertz Drivurself Stations, 174 F.2d 714 (3d Cir. 1949).[28]

We have considered the other contentions of defendant Curtis and find them without merit.

## III. THE CLARK INCIDENT

As we have noted, the jury awarded plaintiff Clark $500 in punitive damages against defendant Volz for his role in the police entry into Clark's apartment at 343 Schley Street, and the alleged physical abuse of Clark by the police, on March 14, 1969. Volz, at the time a Captain in the Newark Police Department, appeals from the verdict, and from the court's denial of his motion for a judgment notwithstanding the verdict. He contends, inter alia, that even the evidence most favorable to Clark provides an insufficient nexus between Volz and the police actions of which Clark complains to support the award of punitive damages. Clark has not entered an appearance on this appeal.

■ After a careful review of the record, we agree that there is no evidence upon which the jury could find sufficient involvement by Volz in the in-

27. Since the issue will no doubt arise if there is a new trial as to plaintiff Bass, we should indicate that we believe that a charge of this nature would be required·if requested by the defendant. Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), involved a warrantless arrest based upon probable cause to believe that a statute later declared unconstitutional had been violated. The Court held that "good faith and probable cause" was a defense to a § 1983 action. Id. at 555–557, 87 S.Ct. 1213.

Two of our earlier decisions had indicated that in a § 1983 suit for damages, good faith was no defense to a violation of constitutional rights by the police. Anderson v. Haas, 341 F.2d 497, 501–502 (3d Cir. 1965); Basista v. Weir, 340 F.2d 74, 81 (3d Cir. 1965). See also Joseph v. Rowlen, 402 F.2d 367, 370 (7th Cir. 1968).

In Bivens v. Six Unknown Named Agents, 456 F.2d 1339, 1347–1348 (2d Cir. 1972), however, it was stated that a good faith defense was available to police officers sued for damages for a constitutional violation under § 1983:

The standard governing police conduct is composed of two elements, the first is subjective and the second is objective. Thus the officer must allege and prove not only that he believed, in good faith,

that his conduct was lawful, but also that his belief was reasonable. And so we hold that it is a defense to allege and prove good faith and reasonable belief in the validity of the arrest and search and in the necessity for carrying out the arrest and search in the way the arrest was made and the search was conducted. We think, as a matter of constitutional law and a matter of common sense, a law enforcement officer is entitled to this protection. Id. at 1348. Several other circuits also have accepted this defense. Hill v. Rowland, 474 F.2d 1374, 1377 (4th Cir. 1973); Rodriguez v. Jones, 473 F.2d 599, 605 (5th Cir.), cert. denied 412 U.S. 953, 93 S.Ct. 3023, 37 L.Ed. 2d 1007 (1973); Jones v. Perrigan, 459 F.2d 81, 83 (6th Cir. 1972).

See also our opinion in Safeguard Mutual Insurance Co. v. Miller, 472 F.2d 732, 734 (3d Cir. 1973); for a stricter test, see Williams v. Gould, 486 F.2d 547, 548 (9th Cir. 1973) (police must prove reasonable belief that the suspect was on the premises).

28. In any event, since the jury awarded punitive damages as against Curtis, it must have found either malice and wantonness, or gross and culpable negligence. We do not perceive how such findings would be consistent with a finding of good faith.

cident to support the award of punitive damages. We will therefore reverse the judgment in favor of Clark and the denial of Volz' motion for a judgment notwithstanding the verdict,[29] and direct the entry of judgment in favor of Volz.

The evidence most favorable to Clark established the following. At around noon on March 14, several police officers forced themselves into Clark's apartment and physically and verbally abused him.[30] They then shuttled him several times between his apartment and the apartment next door. Clark twice saw Volz in the hallway between the two apartments, but said nothing to him. The third time Clark was in the other apartment, Volz was also present. Clark then complained to Volz that because of his bad back he was in pain from being handcuffed, and Volz ordered the handcuffs removed.

The undisputed police testimony, however, was that although Volz was in general charge of the police operation, he had given no specific directions in advance as to the police practices to be used. He did not arrive at the address until *after* the police had allegedly abused Clark, and he never entered Clark's apartment. After Volz did arrive, his only contact with Clark before Clark complained of the handcuffs was to see him passing in the hallway. The only conversation between Volz and the other officers concerning Clark related to the need to check out some guns found in Clark's apartment.

The undisputed evidence establishes that Volz' personal actions at 343 Schley Street do not warrant his being held liable for punitive damages. Clark can prevail, if at all, only by relying on the doctrine of respondeat superior.

The Supreme Court has stated that § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961). In construing the statute pusuant to this mandate, the courts are divided as to whether vicarious liability under the doctrine of respondeat superior is applicable to actions brought under the statute.[31]

We need not decide at this time whether vicarious liability is ever applicable under § 1983. We hold, however, that it will not support an award for *punitive damages*. A superior police officer may not be subjected to punitive damages because of wrongful acts by a subordinate officer if there is no evidence that the superior officer ordered or personally participated in the acts, or knew or should have known that the acts were taking place and acquiesced in them. *See* Restatement (Second) of Torts § 909. Cf. Skeels v. Universal C.

**29.** Since we must reverse the judgment in favor of Clark, we have discretion to enter judgment in favor of the party moving for a judgment notwithstanding the verdict, to order a new trial, or to remand to the trial court to afford plaintiff an opportunity to present a motion for a new trial. *See* Neely v. Martin K. Eby Construction Co., 386 U.S. 317, 87 S.Ct. 1072, 18 L.Ed.2d 75 (1967); Iacurci v. Lummus Co., 387 U.S. 86, 87 S.Ct. 1423, 18 L.Ed.2d 581 (1967); Knuth v. Erie-Crawford Dairy Cooperative Ass'n, 463 F.2d 470, 480 (3d Cir. 1972), cert. denied, 410 U.S. 913, 93 S.Ct. 966, 35 L.Ed.2d 278 (1973).

Our examination of the record does not disclose any grounds which would justify our granting plaintiff Clark a new trial. He had full opportunity at trial to attempt to connect Volz to the alleged police abuses, and his testimony is quite explicit as to the lim-

ited participation by Volz in the incident. Only by modifying his version of the facts could he adduce sufficient evidence to go to the jury on the issue of punitive damages. Under the circumstances we do not believe a new trial would be justified.

**30.** Clark testified that he opened his door to loud pounding and was faced with four plainclothes police officers with drawn guns pointed at him. Forcing themselves into the apartment, one officer yelled an obscenity at him while another officer forcefully struck him in the stomach with a gun.

**31.** *See, e. g.,* Jennings v. Davis, 476 F.2d 1271, 1274 (8th Cir. 1973), and cases cited therein. *See also* Ammlung v. City of Chester, 355 F.Supp. 1300, 1305–1306 (E.D.Pa. 1973), aff'd on other grounds, 494 F.2d 811 (3d Cir. 1974).

I. T. Credit Corporation, 335 F.2d 846, 851–852 (3d Cir. 1964).

Accordingly, (1) the judgment in favor of MacDonald against Bass will be reversed and a new trial will be ordered on both liability and damages; (2) the judgment in favor of Clark against Volz will be reversed and judgment will be entered in favor of Volz; and (3) the judgments as they relate to plaintiffs Fisher, Tresvant, Webbs, and the Ziemoores will be affirmed in all respects.

ALDISERT, Circuit Judge (concurring and dissenting).

I join in all aspects of Judge RO-SENN'S opinion except Part I A.

The district court is reversed for not following a rule which this court enunciates for the first time and which no trial court in this circuit was reqired to follow until today. Our brother Garth, who was the trial judge in this case, can now share in Learned Hand's lament: "How may a judge anticipate a doctrine which may be in the womb of time, but whose birth is distant?"

Nevertheless, it is the nature of our judicial system that trial courts often find themselves charged with reversible error for not applying legal precepts, which, refined on the appellate level for the first time, were not viable or operative at the time of trial. Before a trial judge should be charged with reversible error, however, I believe that the error should be plain or that there should be something in the record to indicate that the newly enunciated law of the case was both suggested by the losing party at trial and rejected by the court. I find neither specific request by counsel nor rejection by the court of the notion that the jury had to be instructed to find that the defendants had probable cause to believe the felon was in the premises before embarking upon a consideration of exigent circumstances. I cannot bring myself to call this plain error. The court did instruct the jury to consider the felon's presence on the premises; the court is faulted only for not using the imperative mood in its instructions on this issue.

Appellant's basic position at trial was simple and forthright. She argued that there was no probable cause as a matter of law, that the police search was unlawful, that her constitutional rights had been infringed, and that she was entitled to damages as a matter of law. The district court rejected this contention. The majority affirms the trial court on this point in I B, and I agree. But plaintiff Bass had an alternative to her basic position and requested the following charge:

5. [Requested only if the lawfulness of the search is held to be a jury matter and if the Court, over objections of the plaintiffs, persists in its view that this case is governed by Dorman v. United States, [140 U.S.App.D.C. 313] 435 F.2d 385 (D.C.Cir., 1970)]

A search of a home without a warrant is lawful only in exigent circumstances and it is for the police to bear the burden of proving these factors. Such circumstances exist only when a grave offense is involved, the suspect is reasonably believed to be armed, there is clearly probable cause that he committed the crime, and a strong reason to believe that he is on the premises, there exists a likelihood that the suspect will escape if not swiftly apprehended, the entry can be made peacefully, and it was not possible to accept the delay of getting a search warrant. Dorman v. United States, [140 U.S.App.D.C. 313], 435 F.2d 385, 392–393 (1970).

While it may be argued with some persuasion that the text of appellants' request carries with it an implication of a mandatory threshold finding of "strong reason to believe that he is on the premises," the fact that this requested instruction was accompanied with a reference to Dorman v. United States, 140 U.S.App.D.C. 313, 435 F.2d 385, 392–393 (1970), can also be interpreted as a request to the court to instruct in

specific accordance with the factors set forth on pages 392 and 393 of that case; which is precisely what the trial court did.

The purpose of Rule 51 F.R.C.P. is to prevent "sandbagging" a trial judge. Counsel is to make a specific request or a specific objection so that the court will have the opportunity of taking corrective action at trial. A careful examination of the record persuades me that the point on which Judge Garth is reversed today was not called to his attention at trial, is the product of original enunciation in this court today, is not plain error, and should not be the basis of reversal.