**UNITED STATES of America,
Plaintiff,**

v.

**Sanford WILLIAMS, Defendant.**

**Crim. No. 48727.**

United States District Court,
E. D. Michigan, S. D.

Nov. 25, 1974.

Ralph B. Guy, Jr., U. S. Atty., Richard L. Delonis, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

Richard A. Rossman and William J. Richards, Detroit, Mich., for defendant.

## MEMORANDUM OPINION

JAMES HARVEY, District Judge.

This is a motion to suppress evidence and to exclude confession filed by defendant Sanford Williams on March 15, 1974. Oral arguments were heard on this motion, and an evidentiary hearing conducted, on April 9, 1974. At that time the Court heard the testimony of two government witnesses and the defendant himself. Post-hearing briefs were submitted shortly thereafter. The Court's ruling on this motion has been delayed by difficulties encountered in obtaining a copy of an FBI communication referred to at the hearing and by the failure of the Court's former reporter to expeditiously provide a transcript of the proceedings. These items having now been received, the Court may proceed to rule in an enlightened manner. It may be stated at the outset that the questions raised herein are difficult ones of search and seizure law, and their answers are closely dependent upon the subtle shadings of the facts.

On December 15, 1973, an indictment was filed in this district charging the defendant with eight counts under the narcotics laws of the United States, specifically Title 21, U.S.C., Section 841(a)(1). Each count alleges possession with intent to distribute a controlled substance, including heroin, marijuana, phencyclidine, and amobarbital-secobarbital.

The events leading up to the indictment begin in Seattle, Washington, on April 27, 1973. On that date a suburban bank was robbed by two men and two women. An investigation by the Federal Bureau of Investigation led to the Rodeway Inn in Portland, Oregon, where it was determined that the female suspects had registered for a room in the early morning of April 29, 1974. Several phone calls were made from the motel before the suspects left later that morning. Two calls were made to the area of Detroit, Michigan. Subsequently, the FBI determined that each female had purchased a ticket to fly from Portland to Detroit, both to arrive before noon on April 30, 1974. A bulletin was sent to the Detroit office of the FBI outlining these facts on May 1, 1974. Agents immediately contacted the telephone company and determined that one of the calls made from the Portland motel went to an address in Detroit, 1250 Calvert, Apartment 207. Thus, sometime after noon, three agents proceeded to that address to ascertain whether a suspect was to be found there. The agents brought with them the various communications which they had received relative to the bank robbery, including facsimiles of the suspects' photos and a bulletin indicating that a complaint had been filed before the United States Magistrate in Seattle on April 30, 1974, and that arrest warrants had been issued that same day.

Special Agent Richard Farley testified at the evidentiary hearing that upon knocking at the door of Apartment 207 and identifying himself, the door was opened by one Robert Mathis. Mathis stated that he did not own the apartment, that the owner, Mr. Williams, would soon be back. Agent Farley noticed a white powder on Mathis' mustache and nostrils and concluded that Mathis had been snorting heroin. At this point, the agents pushed Mathis aside and entered the apartment to search for a suspect. The agents searched the apartment quickly but found no one else present. They then called Drug Enforcement Agent Melvin Smith, telling him to come see the narcotics which they thought they had found on the living room table. Agent Smith's arrival, however, was preceded by that of the defendant Sanford Williams.

The uncontradicted testimony of the defendant is that he returned to his apartment from a doctor's appointment around one o'clock P.M. and knocked on the door. The door was opened by the agents with guns drawn. Williams was "yanked into the apartment, thrown against the wall", and searched. After questioning about the bank robbery and the narcotics found thus far, the defendant was handcuffed and taken to the bedroom. He was not informed of his rights at that time; and when a lawyer was requested and a request to see a search warrant was made, the defendant was told that he could make a phone call later.

When Agent Smith arrived, accompanied by Agent Demmink, Mathis and Williams were officially arrested and their rights were read. The defendant admitted that the narcotics found on the table were his, but denied the existence of other narcotics in the apartment. Smith then asked Williams if he could search the apartment, further advising him that he had a right to refuse to allow a search. Defendant replied in essence, "You're going to do what you want anyway, so you might as well do it." Attempts by the agents to get a more definite response were unsuccessful. Therefore, a call was made to an Assistant U. S. Attorney, who advised

the agents to go ahead and search. The defendant was told also that the agents would get a search warrant if he didn't consent to the search; but, testified Smith, defendant "told us to go ahead because he didn't feel like waiting on a search warrant." (Tr. p. 50). Smith added later, ". . . it was very warm and very uncomfortable that day, and Mr. Williams stated just to go ahead and search and get it on with . . ." (Tr. p. 51).

The agents proceeded to search the apartment. Heroin in a tin foil packet was seized from within a suit coat pocket in the bedroom (Exhibit #12) and from within a shopping bag on the floor (Exhibit #13). A clear plastic bag of heroin was found in a shoe in the bedroom (Exhibit #14), and three more such bags were found under a shelf in the bedroom closet (Exhibits #15, #16, and #17). These seizures and those items seized initially by the FBI agents from the living room table provide the basis of the indictment herein.

The question raised by this motion is whether these seizures, made without benefit of a search warrant, and the inculpatory statements made coincidental to the seizures, are without constitutional validity.

### The First Search.

■ The first search is justified by the government on the basis of the arrest warrant issued by the United States Magistrate in Seattle. Defendant, however, points out that the arrest warrant cannot serve this purpose unless it is valid. This conclusion is merited. In Whiteley v. Warden, 401 U.S. 560, 568, 91 S.Ct. 1031, 1037, 28 L.Ed.2d 306 (1971), Justice Harlan states that

"We do not, of course, question that the . . . police were entitled to act on the strength of the radio bulletin. Certainly police officers called upon to aid other officers in executing arrest warrants are entitled to assume that the officers requesting aid of-fered the magistrate the information requisite to support an independent judicial assessment of probable cause. Where, however, the contrary turns out to be true, an otherwise illegal arrest cannot be insulated from challenge by the decision of the instigating officer to rely on fellow officers to make the arrest."

While accepting this statement as disposing of the basic argument, the government asserts that the arrest warrant has not been shown to be invalid and that the defendant bears the burden to so prove.

■ In United States v. Wright, 468 F.2d 1184, 1185 (CA6 1972), it was held by our Circuit Court of Appeals that ". . . the burden of establishing that the search was improper and that the evidence secured thereby should be suppressed is clearly on the moving party." The court cited in support, United States v. Thompson, 409 F.2d 113 (1969), and Rogers v. United States, 330 F.2d 535 (CA5 1964), cert. denied, 379 U.S. 916, 85 S.Ct. 265, 13 L.Ed.2d 186. It is only after the moving party, i. e., the defendant, has presented a prima facie case of an illegal search that the government must assume a burden of proof that any search made was lawful. See, United States v. Thompson, *supra*, 409 F.2d at 116, 117. No effort having been made by the defendant to show the arrest warrant to be invalid, defendant obviously fails to carry his burden. The warrant, unassailed, must therefore be presumed to be valid. Having reached this conclusion, the next question is whether the agents, acting under a valid arrest warrant, could use that warrant to enter the defendant's apartment to look for the suspected criminal.

A recent opinion by the Third Circuit Court of Appeals deals explicitly with this question. That opinion holds

". . . that police officers may not constitutionally enter the home of an innocent citizen in search of a sus-

**1404**

pected offender for whom they have a valid arrest warrant, even under exigent circumstances, unless they also have probable cause to believe that the suspect will be found on the premises." Fisher v. Volz, 496 F.2d 333, 341–342 (CA3 1974).

In the *Fisher* case, an action brought by private citizens against several policemen for violation of civil rights incurred during the execution of arrest warrants, one plaintiff attempted to argue that in her case the element of probable cause had not been made out as a matter of law. The nexus between the plaintiff, a Mrs. Bass, and the arrest warrant consisted of the following information: While interviewing one suspect's mother, an FBI agent noticed a phone number written on the wall next to a second suspect's name. In checking out the phone number, it was discovered that it was listed in plaintiff's name. The name Bass coincidentally was connected to the suspect by virtue of a prior unrelated arrest. The bank robbery which gave rise to the arrest warrants in question in *Fisher* took place on March 6, 1969. The search of plaintiff Bass' home took place on March 11, 1969. Approximately six hours passed by on the latter day between the time the agent saw the phone number on the wall and the search. The *Fisher* court held that under these circumstances a jury could find probable cause to believe that the suspect would be found at Mrs. Bass' apartment. Parenthetically, the court upon the same facts disposed of the plaintiff's argument that even where the police have a valid arrest warrant and probable cause to believe that the suspect is in a private dwelling, they may not enter the private dwelling of a third party without consent unless they first procure a search warrant for the dwelling. A similar argument is raised by defendant herein.

■ Upon the basis of the *Fisher* case, it is concluded that probable cause existed to believe that a Seattle bank robbery suspect would be found at defendant's apartment in Detroit.* Therefore, it was proper for Special Agent Farley and his fellow agents to enter defendant's apartment as they did on May 1, 1974. Defendant's argument that Robert Mathis had no authority to permit the agents' entry is moot, since not even defendant himself could resist the agents' entry under the facts of this case. In summary, the agents, under authority of an arrest warrant, not shown to be invalid, and issued by a United States Magistrate in Seattle, Washington, could proceed to search defendant's apartment without need of procuring a search warrant because of the existence of exigent circumstances and probable cause to believe the suspect would be found in defendant's apartment.

* In Fisher v. Volz, *supra*, two additional cases were cited as bearing on the presence of probable cause. These are United States v. McKinney, 379 F.2d 259 (CA6 1967), and United States v. Brown, 151 U.S.App.D.C. 365, 467 F.2d 419 (1972) (opinion by Mr. Justice Clark). The factual situations in both cases support this Court's finding of probable cause in the present case. *McKinney* and *Brown* are summarized at 496 F.2d 343, n. 18, fully set out, *infra*: "In McKinney, the police relied upon a month-old tip by an acquaintance of the suspect that the suspect had 'spent some time in or around' the apartment, and a tip from an undisclosed source of undisclosed reliability about noon on the day of the entry that the suspect was then in the apartment. The entry was made 'later that afternoon.' 379 F.2d at 260–261, 263–264.

"In *Brown*, the security guard in an apartment building had identified a photograph of the suspect as being a party 'that he sometimes observed frequent the building' in company with the female occupant of an apartment in the building. The police, who were staking out the building, saw two unidentified men enter the building at 11:00 P.M. the next day. Shortly thereafter they saw a light go on in a window 'in the vicinity' of the apartment window in which they were interested. The police waited until 5:20 A.M. the next morning before going up to the apartment, knocking on the door, and waiting several minutes for the door to be opened. 467 F.2d at 420–424."

■ Having decided that the initial entry was valid, the Court further concludes that the seizure of objects found in plain view in the apartment was valid. The plain view doctrine permits the seizure of items not named in a search warrant where certain other requirements have been met. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). In United States v. Gray, 484 F.2d 352 (C.A.6 1973), our Circuit Court elaborated upon the three-pronged test which must be met before a warrantless search may be validated. See, also, United States v. Winston, 373 F.Supp. 1005 (E. D.Mich.1974). First, the doctrine requires that there be prior justification for an intrusion. That justification is present in this case should be clear from the preceding portions of this opinion. Second, the agents must come across the evidence seized inadvertently. The facts adduced at the evidentiary hearing indicate that the agents pushed their way by Robert Mathis and quickly searched the apartment for the suspect. In so doing, they saw on a living room table the narcotics which provide the basis for Counts 1, 2, 3, 6, and 7 of the indictment.

■ The third prong of the plain view doctrine requires that the objects observed must be immediately recognizable as evidence incriminating the accused. It is not necessary that recognition of the objects as evidence be made beyond a reasonable doubt, but only that the recognition satisfy a probable cause requirement. Agent Farley testified that from his own personal knowledge he recognized the items on the table as being drugs. This conclusion was enhanced by the physical appearance of Mr. Mathis as he greeted the agents at the door. The fact that Agent Farley called for a field test for positive identification should have no bearing, at least in this case, on the element of immediate recognition. Cf., United States v. Sheard, 154 U.S.App.D.C. 9, 473 F.2d 139 (1972). Therefore, the seizure of the items enumerated above must be held to be constitutionally valid.

*The Second Search.*

The items which provide the basis for the remaining counts of the indictment were found by a subsequent search of defendant's apartment by DEA agents. These agents were called to the apartment to validate positively the finds made initially by the FBI. Upon verifying the existence of drugs, Agent Smith asked the defendant to allow a search for more drugs. As indicated above, defendant's answers to this type of questioning amounted, in the agents' opinions, to a consent to search. Defendant contends that this search is invalid for several reasons.

First, it is alleged that a complete search took place immediately upon entry by the FBI, the implication being that the search by the DEA agents was a facade to legitimate that earlier search. The facts, however, as adduced at the evidentiary hearing, do not bear out such a conclusion.

Secondly, defendant contends that he did not consent to a search of his apartment, and if he did, it was not voluntary.

It is helpful, in reaching a decision on this question, to analyze defendant's status at the point in time the government claims that consent was given. There is, apparently, a different approach to be taken depending upon whether a defendant is in custody or not. For example, Schneckloth v. Bustamonte, 412 U. S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), which deals with consent searches, specifically limits itself to application where "the subject of a search is not in custody." 412 U.S. at 248, 93 S. Ct. at 2059. In note 29, p. 240, 93 S.Ct. p. 2055, Justice Stewart states:

"... the present case does not require a determination of the proper standard to be applied in assessing the validity of a search authorized solely by an alleged consent that is obtained from a person after he has been

placed in custody. We do note, however, that other courts have been particularly sensitive to the heightened possibilities for coercion when the 'consent' to a search was given by a person in custody. See, e. g., Judd v. United States, 89 U.S.App.D.C. 64, [66,] 190 F.2d 649, 651; Channel v. United States, 285 F.2d 217 (9 Cir.); Villano v. United States, 310 F.2d 680, 684 (10 Cir.); United States v. Marrese, 336 F.2d 501 (3 Cir.)."

This Court can see no conclusion upon analysis of the facts here other than that defendant was in a custodial situation at the point that he was asked to consent to a search of his apartment.

■■■ Upon examination of the four cases cited in note 29 of the *Schneckloth* opinion, *supra*, at p. 240, 93 S.Ct. 2041, it is clear that the second search cannot be upheld. The holdings of these cases may be summarized as follows: Where the government attempts to justify a warrantless search on the basis of the consent of the accused, the government must show that the accused gave his unequivocal and specific consent to the search. It must show that there was no duress or coercion, express or implied; however, as pointed out in Villano v. United States, *supra*, 310 F.2d at 684, "Coercion is implicit in situations where consent is obtained under color of the badge, and the government must show that there was no coercion in fact." Where the accused is in custody, whether in his own home or otherwise, words or acts which may show consent in some circumstances may not show consent in that setting. Non-resistance to the police is an expected reaction at such times. See, also, Higgins v. United States, 93 U.S.App.D.C. 340, 209 F.2d 819 (1954).

■■■ The cases recognize, however, that a search permitted by one in custody may be legitimate despite the virtual presumption otherwise. For example, a valid confession may precede the search.

This obviates the conclusion made in Higgins v. United States, *supra*, that "no sane man who denies his guilt would actually be willing that policemen search his room for contraband which is certain to be discovered." 209 F.2d at 820. Here, no confession was made prior to the arrival of the DEA agents. The testimony of Agent Smith shows that after a positive test had been made of the narcotics on the living room table, and defendant had been read his rights, defendant made a statement to Smith "to the effect that everything in the apartment was his. He made this—in an effort to take the context of his statement, it was in a mannerism where he was taking part of the burden of the responsibility off of the gentleman, Mr. Mathis." (Tr. p. 27). Defendant was asked if there were any more narcotics in the apartment. He denied that there were. If this was the case, the agent responded, would defendant permit a search of his apartment? At this point, the defendant answered, and continued to answer, to the effect that, "You are going to search anyway, so you might as well go ahead." Defendant maintains also that he continually asked to see his lawyer during this time.

This factual situation does not show a broad confession which would eliminate all barriers to finding a consensual search. If there was a confession, it was only regarding the drugs already discovered. Defendant denied at all times the presence of more drugs in his apartment. The words which the government construes to be consent to a general search represent only the "false bravado of the small-time criminal." Judd v. United States, *supra*, 190 F.2d at 651. The words of the defendant are not unequivocal nor indicative of non-resistance. Finally, the government was in a position to have obtained a search warrant but failed to do so, and no exigent circumstances existed to justify a warrantless search. Therefore, the products of the second search must be suppressed. These would include gov-

ernment Exhibits #12 through #17, which apparently provide the basis for Counts 4, 5, and 8 of the indictment.

The remaining question concerns the suppression of statements made by the defendant during the proceedings at his apartment. This aspect of the motion was not developed fully at the evidentiary hearing, and thus it is difficult for the Court to make a ruling in this regard. However, the theory upon which the defendant seeks to suppress any incriminating statements made in relation to the second search proceeds on the basis that the first search was illegal and tainted subsequent events. Since the Court has already found the first search to be legal, it cannot suppress defendant's statements upon the basis which is put forth.

In conclusion, the defendant's motion to suppress is granted in part and denied in part in accordance with and for the reasons expressed above.