STATE of Missouri, Respondent,

v.

Willis R. CLARK, Appellant.

No. KCD 28318.

Missouri Court of Appeals,
Kansas City District.

May 2, 1977.

Motion for Rehearing and/or Transfer
Denied June 1, 1977.

Application to Transfer Denied
July 11, 1977.

Robert G. Duncan, Robert E. Hart, Duncan & Russell, Kansas City, for appellant.

John C. Danforth, Atty. Gen., David L. Baylard, Asst. Atty. Gen., Jefferson City, for respondent.

Before SHANGLER, P. J., and WELBORN and HIGGINS, Special Judges.

ROBERT R. WELBORN, Special Judge.

Appeal from judgment of conviction and sentence to life imprisonment entered on jury verdict of guilty on a charge of murder in the first degree.

Charles Davis was employed in April, 1974 by the Unity School of Christianity as superintendent of maintenance for its institutional property, located between Kansas City and Lee's Summit in Jackson County. After dinner on the evening of December 6, 1974, Davis received a telephone call at his home, purporting to be from a state boiler inspector. He left his home shortly before 8:00 P.M. after making a notation: "Boiler Inspector, State of Missouri, 12–6–74, 8:30 p. m., Spaulding."

At around 11:00 P.M., Davis was found on the floor of his office in the shop building at Unity, dead from gunshot wounds in the head and chest. Upon an autopsy two projectiles were recovered from Davis's body and turned over to police. The medical examiner's opinion was that death occurred between 9:00 and 10:00 P.M., December 6, 1974.

At about 8:30 P.M., December 6, 1974, John Fines, a security officer at Unity, noticed a vehicle parked on a gravel road leading into the farm property from Colborn Road. He stopped the vehicle he was driving and got out and examined the parked auto, a 1966 Ford. He saw no one there. He noted the license number and radioed a call to the Unity operator, asking her to have a check made of the number. The Unity operator's radio log showed that at 8:30 she made inquiry of the State Highway Patrol about the license number and found that it had been issued to Willis Clark, Lee's Summit, and that the vehicle had not been reported stolen.

Fines drove to the Colborn Road entrance to Unity Village where he could watch the parked Ford. After ten or fifteen minutes, he saw the backup lights of the Ford go on and the car was backed out and started east on Colborn Road at a high rate of speed. Fines pursued the Ford for 1½ to two miles with his flashing red lights on, but he was out-distanced and temporarily lost sight of the Ford. He next saw it stopped on the shoulder at the southeast corner of Independence and Colborn Roads. Willis Clark was standing beside the Ford, taking off a pair of jeans or coveralls. Fines stopped his car and radioed Lee's Summit police for assistance. He spoke to Clark who accused Fines of forcing him off the road. Clark denied that he had been at Unity Village, although the license number on the Ford was the same as that observed by Fines while the vehicle was parked. Lee's Summit police came to the scene and after discussion of the incident Clark was allowed to proceed.

Shortly after 11:00 P.M. Fines received a call about an emergency at the maintenance shop. He went there and found another Unity employee over Davis's body lying on the floor. The two first thought Davis had suffered a heart attack, but they discovered the bullet wounds and called the Jackson County Sheriff's Patrol. Fines told the officers about his encounter with Clark earlier in the evening.

At around 1:00 A.M., December 7, Jackson County sheriff officers went to Clark's residence at Lee's Summit. Clark was there and at the request of the officers he went to the Jackson County sheriff's office for an interview. That interview is the subject of one of the claims of error here and will be dealt with more fully in that connection.

At around 7:00 A.M., December 7, an officer was directed to search the area in the vicinity of Independence and Colborn Roads. The officer found several pieces of torn paper in a grassy field at the southeast corner of the intersection. The pieces were put together and found to make a page from a desk calendar for October 24, with the number 297 in the lower left-hand corner. When the bits of paper were pieced together, the following written message appeared:

"Hello. I'm Lazier Spaulding of the State Department of Boiler Inspection. The Unity operator gave me your number. I meant to get in touch with you earlier relative to inspection of two new boilers in the shop area but I had car trouble and my car has been being worked on all afternoon. I would like to head home this evening if I could make the inspection, it takes just forty-five."

A warrant was obtained for the search of Clark's residence. Officers were admitted to the house by Mrs. Clark. Items of clothing and weapons described in the warrant were seized. Officers saw and seized a desk calendar with pages similar to that which had been found.

Officers continued to search along Colborn Road. An old "owl head" .32 caliber revolver and a box, partially filled with .22 caliber shells, were found. Later in the afternoon officers searching along Colborn Road near the Unity entrance found a .22 caliber revolver on the north side of Colborn Road, about .4 mile east of Unity Village. There were six empty shell casings and two live rounds in the weapon when found. Subsequent ballistics tests showed that the projectiles taken from Davis's body had been fired from this weapon.

Clark has been employed at Unity from 1955 to 1968 in the maintenance section. His employment was terminated because he did not get along with the maintenance director and he was suspected of pilfering materials. In January, 1974, the president of Unity had received a letter from Clark, expressing an interest in returning to work at Unity. The maintenance supervisor with whom Clark had difficulty was preparing to retire and Davis was employed as his successor in April, 1974. In June, Clark had an interview with the Unity president who told Clark that Davis had been hired for the job.

Inasmuch as there is no contention here that the evidence was insufficient to support the conviction, there is no need to detail all of the evidence adduced by the state in support of the charge of murder in the first degree against Clark.

Testifying in his own behalf, Clark denied that he killed Davis. He denied that he had parked his auto in the place where Fines testified he saw it. According to Clark, he had received an anonymous call at his house around 8:00 P.M. on the night in question that a tenant appeared to be moving out of a residence leased from Clark and he was driving to investigate that possibility when he saw a car behind him, approaching at high speed. He saw no red lights on the vehicle. He pulled off the road at Colborn and Independence to allow the vehicle to pass. The car stopped and then the red lights came on. According to Clark, Fines accused him of stealing apples at Unity. Clark accused Fines of driving like a maniac and told him he had not been at Unity farm.

The jury returned a verdict of guilty of murder in the first degree and fixed the punishment at life imprisonment. After his motion for new trial was overruled, defendant appealed.

Appellant's first point relates to the overruling of his motion to quash the search warrant and to suppress the use in evidence of the desk calendar discovered in the search at appellant's residence. Appellant's first ground of complaint is that the search

warrant was invalid because it was not issued pursuant to a written application, required by § 542.276, RSMo 1975 Cum. Supp.

At the hearing on the motion to quash the search warrant, the defendant offered in evidence three documents pertaining to the search warrant. They were an "Affidavit for Search Warrant," executed by John Fines, a "Search Warrant," issued by a Judge of the Jackson County Magistrate Court, and a "Receipt for Search Warrant," executed by Sergeant Jack Morton of the Jackson County Sheriff's Patrol.

▮ Section 542.276, supra, does refer to a written application for a search warrant and also states that the application shall be supplemented by written affidavits, to be considered in determining whether there is probable cause for a search warrant. These requirements do not preclude the situation in which a single document, properly verified, whether it be denominated an "Application" or "Affidavit," fulfills the requirements of an application and states adequate grounds for a finding of probable cause for issuance of the warrant. "The initial application [for a search warrant] is generally in the form of an affidavit, the purpose of which is to present to the issuing authority a factual basis for the determination whether probable cause exists for making the desired search or seizure." 68 Am. Jur.2d, Searches and Seizures, § 63, p. 715 (1973).

▮ In the trial court, the sufficiency of the affidavit to support a finding of probable cause was objected to, but that complaint has not been renewed here. The objection here solely to the absence of an application for a search warrant is without merit and appellant has advanced no other reason in support of his contention that the search warrant was invalid.

Appellant contends further that, without regard for the validity of the search warrant, the seizure of the calendar was invalid *because* it fell within the class of items, the seizure of which may not be authorized under a search warrant. Appellant relies upon § 542.271, RSMo Cum.Supp.1975, which enumerates items which may be seized pursuant to warrant and excepts "private papers or business records."

▮ Appellant's contention that the desk calendar fell within this exception is limited to the statement that appellant was engaged in the real estate business in addition to his employment at the Kansas City Skills Center and that "a calendar such as the type that was seized is very commonly used by businessmen in keeping track of their engagements and also in making memoranda of calls. Few calendars in the business world are used exclusively for telling the date alone." However, he makes no attempt to demonstrate that the protection against self-incrimination which extends to private papers of a testimonial or communicative nature (*United States v. Vickers,* 387 F.2d 703, 707[7–9] (4th Cir. 1967)), (cert. denied, 392 U.S. 912, 88 S.Ct. 2069, 20 L.Ed.2d 1369 (1968)), applies to the calendar in this case.

Finally, appellant contends that, even if the search warrant was valid and a warrant might have authorized seizure of the calendar, the warrant in this case failed to enumerate the calendar among the articles authorized to be seized.

▮ Although both federal (Amendment IV) and state (§ 15, Art. I, Const. of Mo.1975) constitutions require a search warrant to describe the "thing[s] to be seized," it is recognized that, in the execution of a search warrant, officers may seize items not specified in an otherwise valid warrant, when the item is reasonably related to the purpose of the search and its seizure is within a recognized exception to the requirement for a search warrant. *Taylor v. State of Minnesota,* 466 F.2d 1119, 1121[1–3] (8th Cir. 1972); cert. den. 410 U.S. 956, 93 S.Ct. 1425, 35 L.Ed.2d 689 (1973); *United States v. Golay,* 502 F.2d 182, 184–186[1, 2] (8th Cir. 1974); *United States v. Canestri,* 518 F.2d 269, 274[8–10] (2d Cir. 1975). In this case, the warrant issued for the search of appellant's residence and the seizure of weapons and articles of clothing linking appellant to the death of Davis. The search

was conducted by Sergeant Morton, to whom Deputy Starr had delivered the torn up calendar pages found by him. Sergeant Morton saw the calendar on a telephone stand when he was in the house pursuant to the warrant. The object was in plain view. It was reasonably related to the items specified in the warrant.

Appellant contends that the plain view doctrine cannot apply because the pages of the calendar had to be turned in order to discover that page 297 was missing from it. "The third prong of the plain view doctrine requires that the objects observed must be immediately recognizable as evidence incriminating the accused. It is not necessary that recognition of the objects as evidence be made beyond a reasonable doubt, but only that the recognition satisfy a probable cause requirement." *United States v. Williams,* 385 F.Supp. 1400, 1405[6] (D.C., E.D.Mich.S.D., 1974). The sight of the calendar in plain view with pages such as those upon which the incriminating message appeared was sufficient to give the officer probable cause to believe that the page came from the calendar and that the calendar would, therefore, be of evidentiary value. In the *Williams* case, the officer saw a white powder which he thought, based on his experience, was heroin. The fact that a test was required to make certain that it was did not preclude a plain view seizure.

The cases relied upon by appellant on this issue are not helpful. *United States v. Sanchez,* 509 F.2d 886 (6th Cir. 1975), involved a seizure by a federal officer who had accompanied a state officer in execution of a state search warrant. The federal officer participated in the search with a preconceived idea of searching for objects not included in the search warrant. In *Haefeli v. Chernoff,* 394 F.Supp. 1079, 1082–1083[4–7] (U.S.D.C., Mass., 1975), the court did hold that the plain view doctrine did not permit seizure of checks which barely protruded from an envelope where their removal from the envelope was required to establish their incriminating effect. The situation is factually different, but, more significantly here, the District Court judgment was reversed on appeal. 526 F.2d 1314 (1st Cir. 1975).

Appellant also argues that the sighting of the desk calendar was not inadvertent. He argues that the officers, aware of the sheet from the calendar found as above described, must have realized that the sheet would have come from a calendar in the house of appellant which they sought to search. This proposition is sheer speculation. The warrant was sought to search for and seize clothing and weapons which appellant had told the officers were at the residence. The questioning of appellant had ceased before the calendar sheet was found and he had not been questioned about that item.

■ Appellant finally objects that at the close of the pre-trial hearing on the motion to quash the search warrant and to suppress evidence, the prosecutor had stated to the court that he did not propose to use the calendar in evidence. The record is not entirely clear whether the statement of the prosecutor related to the desk calendar or to another item, referred to as "a calendar with notes." In any event, when the desk calendar was offered in evidence, the objection was a renewal of the pre-trial motion to suppress, coupled with a further objection that the object was irrelevant and immaterial. No reliance was placed on the prosecutor's pre-trial statement. Nor does the motion for new trial assign error on such basis. Therefore, objection on this ground may not be raised for the first time on appeal.

Appellant has demonstrated no error on the part of the trial court based upon its action on his motion to quash the search warrant and to suppress the use in evidence of the desk calendar.

Appellant's second assignment of error is that the trial court erred in permitting testimony to his in custody incriminating statements. A motion to suppress evidence of defendant's statements was filed and a hearing held on the motion. The only testimony at the hearing came from two officers who participated in the interrogation. According to the officers, they went to Mr. Clark's residence in Lee's Summit at around 1:00 A.M. following the discovery of Davis's

body. They advised appellant of his rights and asked him to accompany them to the sheriff's office in connection with their investigation. Mr. Clark called Mr. William Collet, an attorney who had previously handled legal matters for him. The two had a rather lengthy conversation and Mr. Collet also talked with two of the officers. After these conversations, Clark agreed to go to the sheriff's office and did so, travelling in his own automobile.

When Clark arrived at the sheriff's office at Lake Jacomo at around 2:15 A.M., he was again advised of his rights and asked to sign a "Waiver," acknowledging that he had read the statement of his rights and his willingness to answer questions without the presence of an attorney. Clark declined to sign the waiver because he had been advised by Collet not to sign anything.

The interrogation proceeded. At 3:00 A.M., Clark was placed under arrest, again advised of his rights and the interrogation continued until 4:00 A.M. The hearing on the motion to suppress did not go into the content of the statements made during the interview. The officers stated that Clark repeated the same thing many times. According to them, he at no time requested that the interrogation cease and he spoke freely and voluntarily.

The trial court overruled the motion to suppress the statement of the defendant. At the trial, the objections stated in the motion were renewed.

At the trial, the officers testified that appellant told them that he was checking on the report that his tenant was moving when he was stopped by Fines. He denied that he had been in the vicinity of Unity Village and told the officers that, if his car had been seen there, it must have been stolen. One of the officers described appellant as "highly nervous and upset and crying a lot." Another officer stated that once or twice Clark lay down on the floor during the interrogation.

Testifying in his own behalf at the trial, the appellant stated that, when the officers came to his house around 1:00 A.M. and told him that they wanted to interview him about a homicide, he called Mr. Collet because he was "scared." He said that the officers told him that he could come with them for an "interview" that night or come out in the morning. "I said that I would come out tonight." According to the appellant the interrogation continued "off and on" until 1:15 P.M. the next day. He acknowledged that he cried during the interrogation and that he lay on the floor when they left him alone a little bit because he "was just all wore out * * *."

Appellant contends that, in view of his refusal to sign the "waiver" tendered to him, the state failed to bear its burden of proving that the custodial interrogation which resulted in statements damaging to his defense was a voluntary and intelligent waiver of his privilege against self-incrimination and right to the assistance of counsel.

■ Appellant's position is that his refusal to sign a waiver should have caused the officers to expand upon their advice as to his rights to make certain that he understood that any oral statement which he might make could be used against him, whether or not it was reduced to writing. Appellant's argument assumes that he was under a misapprehension on this score. Appellant made no such complaint at either the pre-trial hearing or in his trial testimony. Unquestionably, the state had the burden of proving that the statements used in evidence were the product of an interrogation in which appellant engaged voluntarily and knowingly. Evidence that he refused to sign the waiver is a matter for consideration in the determination of the legal voluntariness of the statement in the light of all of the surrounding circumstances. " * * [I]t becomes necessary to look at all the circumstances surrounding the interrogation to ascertain whether defendant's refusal to sign a waiver demonstrated that he was unwilling to forego his constitutional right to remain silent." *State v. Sterling,* 536 S.W.2d 843, 848 (Mo.App.1976). See also *Sterling v. Wyrick,* 419 F.Supp. 80, 83[4, 5] (D.C., W.D.Mo., 1976); *State v. Auger,* 434 S.W.2d 1, 5–6[9] (Mo.1968).

■ In this case, appellant first spoke with an attorney before accompanying the officers to the sheriff's headquarters. By appellant's own testimony, he was given the choice of going to the sheriff's office at around 1:00 A.M. or waiting until the next day. Appellant chose to go in the early morning hours. The officers testified that the interrogation proceeded without complaint from appellant and that he spoke freely and voluntarily.

Appellant extracts one reply made by one of the officers to a question asked on cross-examination by defense counsel at the trial. The officer was asked: "Did he (the defendant) tell you that his attorney advised him not to talk to you?" The officer replied affirmatively. On direct examination the officer had testified that, when they went to appellant's residence, the appellant called attorney Collet by telephone and spoke to him at length, that he and another officer also spoke to Collet and explained the reason they wanted to interview appellant " * * * and the attorney advised him to voluntarily go to our headquarters for an interview at Lake Jacomo." The other officer who spoke with Mr. Collet testified that Mr. Collet told him that if appellant "wanted to he could go on to headquarters with us to interview." In view of this evidence, the answer to the question on cross-examination cannot be held to have shown that the interrogation proceeded in the face of a claim by appellant of his right to remain silent.

Appellant argues that the situation in this case calls for the rule applied in *United States v. Nielsen*, 392 F.2d 849 (7th Cir. 1968). In that case, the court held that when a suspect who has an attorney refuses to sign a waiver of rights and then expresses an apparent willingness to allow further questioning the situation "should have alerted the agents that he was assuming seemingly contradictory positions with respect to his submission to interrogation." The court held that the agents should have inquired further "to determine whether his apparent change of position was the product of intelligence and understanding or of ignorance and confusion." The court concluded that in the absence of further inquiry the response to further interrogation was not made "after a knowing and intelligent waiver of his rights." 392 F.2d at p. 853.

There is certainly no unanimity among the federal courts on the question of the meaning and effect to be given to a refusal to sign a waiver of rights by a suspect who thereafter assents to police interrogation. See cases cited in *United States v. Kallevig*, 534 F.2d 411, 414–415 (1st Cir. 1976). This court follows the rule previously announced in *State v. Sterling*, supra, and applied federal authority. See cases cited at 536 S.W.2d 849. In any event, *Nielsen* is distinguishable in that the attorney there involved had been retained by the defendant to represent him, whereas here appellant had not retained counsel but merely called upon an attorney of his acquaintance.

Appellant has not demonstrated error in the trial court's ruling on his motion to suppress the results of his custodial interrogation or in the admission of such evidence at his trial.

Appellant next contends that the trial court erred in admitting without proper foundation expert testimony comparing purported exemplars of appellant's handwriting for the purpose of establishing his authorship of the incriminating note on the calendar sheet.

In his examination of the note (State Exhibit 50), the handwriting expert compared the writing there with three documents. One was a letter purportedly written by appellant to the President of Unity, requesting an opportunity to discuss employment of appellant by Unity. The letter was dated January 26, 1974. The second document used for comparison was an application by Clark, dated August 17, 1955, for employment at Unity. The third document was a page from a personal information form which had been sent to all Unity personnel in 1966. These two documents were taken from Clark's personnel file in the office of personnel director at Unity.

When the state's witness began to testify to his comparison of the writing on Exhibit 50 with the writing on these three documents, defense counsel objected on the grounds that the state had not shown that the handwriting on the three documents used as exemplars was the handwriting "of any particular person." The objection was overruled and the witness demonstrated similarities in the handwriting on those documents with that on Exhibit 50. He then expressed the opinion, over similar objection, that all were in the same handwriting. At the conclusion of the case, defense counsel moved to strike the expert's testimony. The motion was overruled.

The issue presented by this claim of error must be viewed in the light of § 490.640, RSMo 1969, which provides:

"Comparison of a disputed writing with any writing proved to the satisfaction of the judge to be genuine shall be permitted to be made by witnesses, and such writings and the evidence of witnesses respecting the same may be submitted to the court and jury as evidence of the genuineness or otherwise of the writing in dispute."

Appellant has ignored that statute and its import in this case. He has relied on *McLendon v. Leighty,* 320 S.W.2d 735 (Mo. App.1959), and *Cummins v. Dixon,* 265 S.W.2d 386, 394–395[7–10] (Mo.1954), as prescribing the nature of the proof required for the authentication of the documents relied upon by the state as handwriting exemplars. Those cases did not involve the authentication of documents for such purpose.

■ As the statute provides, the authenticity of a document to be employed as an exemplar must be established "to the satisfaction of the judge to be genuine * * *." In this case there was no direct evidence that the documents employed by the state for such purpose were in appellant's handwriting. However, the authenticity of such documents may be shown *circum*stantially. 29 Am.Jur.2d, Evidence, § 807, pp. 897–898 (1967). "There is no precise method by which a specimen must be proved to be genuine and the proof may

be either direct or circumstantial. *Dean v. United States,* 246 F. 568, 576 (5th Cir. 1917). The courts have not restricted the manner in which specimens may be proved genuine and each case must be viewed on its own facts." *United States v. White,* 444 F.2d 1274, 1280[12] (5th Cir. 1971). See *United States v. Wagner,* 475 F.2d 121, 123[1–3] (10th Cir. 1973).

"The action of the court in admitting or rejecting a specimen as a standard, is a matter of discretion. Its action is final and conclusive unless based on an error of law, or on evidence which is, as a matter of law, insufficient to justify its finding, * * *." 32 C.J.S. Evidence § 617, p. 781 (1964); *State v. Boyington,* 544 S.W.2d 300, 305–306[12, 13] (Mo.App.1976).

■ In this case, there was substantial circumstantial evidence of the genuineness of the letter used as a specimen. Obviously, this was not a reply letter. However, it did form the basis for activity by appellant in accordance with the terms of the letter. He was, as he requested, granted an interview with the addressee of the letter. Testifying in his own behalf, appellant admitted that he had written such a letter and that the content of the letter in evidence was "familiar" to him. In these circumstances, his denial that the letter was in his handwriting was not conclusive. *Wilson v. Scroggs,* 85 Colo. 537, 277 P. 784 (1929).

Furthermore, when the letter was offered in evidence, the objection to it was based upon lack of relevance, not insufficient authentication. On cross-examination of the Unity president, who had produced the January 26, 1974 letter, defense counsel asked "Now, in response to Mr. Clark's letter of * * * January 26, 1974, you wrote him a letter, did you not?" The witness replied affirmatively and identified his reply which was put in evidence as a defendant's exhibit.

Insofar as the letter is concerned, there was substantial circumstantial evidence of its genuineness and the trial court's ruling with respect to its use should not be disturbed.

The other two documents present a more difficult problem. The state suggests that, if one document was properly admitted, all these were, because the expert testified that they were, in his opinion, all in the same handwriting. This position is contrary to the " * * * general agreement that genuineness cannot be established by comparison (by experts or otherwise) of the proposed standard itself with another writing * * *." Annotation: "Mode and degree of proof required to establish genuineness of handwriting offered as standard or exemplar for comparison with a disputed handwriting or signature." 41 A.L.R.2d 575, § 5, p. 583 (1955).

It was, therefore, necessary for the state to establish the genuineness of the other two documents other than by the experts' opinion that they were in the same handwriting as the letter.

One document was an application for employment at Unity, dated August 17, 1955. The second was described as a personal information form, obtained from Unity employees in 1966. The personnel director who presented them was not at Unity when Clark was first employed there and he offered no testimony as to the manner of preparation of the documents. The state apparently relied upon the "Uniform Business Records of Evidence Mo., § 490.680, RSMo 1969, in offering the documents. The Business Records Law is designed to obviate hearsay objection, and does not render all business records competent evidence for whatever purpose they may be offered. *Tile-Craft Products Co., Inc. v. Colonial Properties, Inc.,* 498 S.W.2d 547, 549[3] (Mo. 1973).

In supporting the trial court's action, the state relies upon *United States v. Liguori,* 373 F.2d 304 (2nd Cir. 1967). In that case the handwriting of the defendant was in issue with respect to a note which accompanied narcotics. The government handwriting expert used as exemplars a lease application, a key application, an automobile application, all in defendant's name and purportedly signed by him. The court summarily rejected appellant's contention that the exemplars had not been authenticated, stating:

"Only baseless speculation could assign these documents to any hand other than that of appellant." 373 F.2d at 306.

A more reasoned approach to the question is to be found in *United States v. Swan,* 396 F.2d 883 (2nd Cir. 1968). In that case, the government handwriting expert used as exemplars application and registration forms submitted by the defendant as a university student. The defendant admitted that his signature appeared on the forms but objected to the use of the writing on the record as exemplars for comparison with the defendant's alleged handwriting in issue in the case. In ruling on the issue on appeal, the court stated:

"We find that Judge Mishler did not err in denying defendant's motions to strike the Columbia University records and the testimony of the government's handwriting expert. 'The admitted or proved handwriting of any person shall be admissible for purposes of comparison, to determine genuineness of other handwriting attributed to such person.' 28 U.S.C. § 1731. The government proved the genuineness of the exemplars to the satisfaction of the court. In order to secure reversal on appeal of the trial court's ruling defendant must show that the ruling was not fairly supported by the evidence. *Citizens' Bank & Trust Co. of Middlesboro, Ky. v. Allen,* 43 F.2d 549, 550–551 (4th Cir. 1930); Annotation: Genuineness of Exemplar-Proof, 41 A.L.R.2d 575, 582 (1955); 2 Wharton's Criminal Evidence § 582 (R. A. Anderson 12th ed. 1955); 7 Wigmore on Evidence § 2020 (3rd ed. 1950). The defendant has failed to meet this burden.

"Co-defendant Portoghese testified that the printing on the Columbia University records is 'similar to Donald Swan's,' and that the printing looked the same as the printing on some checks that Portoghese received from Swan. While Portoghese was not absolutely certain that the printing was Swan's, the combination of his testimony and the inference which the trial judge

could draw from the nature of the papers themselves and the testimony of the Assistant Registrar was a sufficient foundation for their admission for use as an exemplar of Swan's handwriting and printing. *Butler v. State,* 38 Ala.App. 527, 93 So.2d 441, cert. denied, 265 Ala. 694, 93 So.2d 445 (1956).

"The trial judge was entitled to rely in part upon the circumstantial evidence before him. *Dean v. United States,* 246 F. 568 (5th Cir. 1917). As in the *Dean* case, this court has examined the documents used as exemplars. We find that they are of such a character that there is a strong inference that they were filled out by the signer. Each of the registration cards has a space marked 'STUDENT'S SIGNATURE' in which appellant admittedly wrote 'Donald A. Swan.' At the top of each card are instructions: 'Print your name exactly as it should appear on all official records.' On each card the name 'Donald Arthur Swan' is printed in the same color ink as Swan's admitted signature. The body of the cards and other documents are filled out in a mixture of block printing and script. In each case the writing is all in the same color ink and appears similar to the printed and written names. An Assistant Registrar of Columbia University testified at the trial that it is customary for students to fill out their own registration cards. This clearly is sufficient evidence from which the trial judge could infer that Swan, who admittedly signed the cards, also filled them out. See *United States v. Liquori,* 373 F.2d 304 (2d Cir. 1967)." 396 F.2d at p. 885[2].

In *United States v. Greiser,* 502 F.2d 1295, 1298[3] (9th Cir. 1974), an application for employment was found sufficiently authenticated to permit its use as an exemplar. In that case, a fellow employee, familiar with the defendant's handwriting, testified that he recognized the writing and printing on the application as that of the defendant. See *Estate of Fedina v. Fedina,* 491 S.W.2d 552, 558[3, 4] (Mo.1973).

In *Scharfenberger v. Wingo,* 542 F.2d 328, 336–337[8–11] (6th Cir. 1976), a job application, signed by the person whose writing was in issue, and taken from the official files of the state where he was employed, was held to have been sufficiently shown by circumstantial evidence to have been genuine. In that case the court noted that "the exemplars were taken from documents from the state's official files, which were prepared long before the litigation began. Moreover, the documents were taken from the files of the Commonwealth of Kentucky, which had been the employer of all of the defendants here. There was no evidence tending to show that the documents were not written by Dr. Salb. In these circumstances, the record adequately supports the trial court's implicit ruling that the exemplars were genuine samples of Dr. Salb's handwriting." 542 F.2d at p. 337.

The last three cited federal cases were decided without the benefit of Federal Rule 901, designed to facilitate the authentication of documents for use in evidence. Rule 901(a) provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The state urges acceptance of this standard of authentication as more consistent with commonly accepted public experience than the more rigorous standards employed by the law for proof of the genuineness of writings.

Without the necessity of going this far, it can be concluded that the trial court's conclusion that these documents were genuine was based upon substantial evidence. The documents have been submitted here for examination. *United States v. Swan,* supra. The application for employment does not purport to bear appellant's signature. However, the application clearly refers to appellant and at least one question is answered in the first person, singular ("Why did you leave?" "Because my employer is getting ready to sell business.") The appearance of the document is consistent with its date, August 17, 1955, negativing any suggestion of fabrication for use in this case.

The page from the personal information sheet requests "a paragraph (in your own handwriting please) explaining why you choose to work in Unity * * *." The handwritten portion, bearing the signature "Willis R. Clark" bears information consistent with the evidence as to Clark's employment there and it is also consistent with the application for employment. "I chose to work at Unity School in 1955 because my wife worked there * * *." The application shows that Clark's wife was employed at Unity at the time of the application.

Admittedly these documents did not have the benefit of direct proof of their authenticity. However, the circumstances were sufficient to allow the trial court to be satisfied of their genuineness as he presumably was when he allowed their use as exemplars. *State v. Pace,* 269 Mo. 681, 192 S.W. 428, 431[7] (1970). Appellant has not shown that his conclusion was in error.

For his final point, appellant asserts that the trial court erred in rulings on several of his objections to the admission of evidence and that the cumulative effect of such errors calls for a reversal of the judgment of conviction. As the state points out, the adequacy of the point as stated in appellant's brief is highly doubtful, inasmuch as the point is stated abstractly and does not refer specifically to the rulings objected to. Rules 28.18, 84.04(d). Furthermore, appellant has not briefed the claimed error with respect to the rulings questioned. He merely asserts that the trial court's ruling in each instance was erroneous, but offers no authority in support of his position. The only authority cited is in support of the proposition that error is not harmless if there was a reasonable possibility that the error complained of contributed to the finding of guilt. Obviously, some error must have been demonstrated before that proposition may become applicable. Something more than a mere assertion of error is required before an appellate court will consider the claim. Claims of error "without citation of authority and little or no argument * * * are not reviewable." *State v. Warters,* 457 S.W.2d 808, 811[1–5] (Mo.

1970); *State v. Schulten,* 529 S.W.2d 432, 434 (Mo.App.1975). What appellant describes as the "more minor errors" have not been adequately presented for appellate review.

Judgment affirmed.

All concur.