UNITED STATES of America

v.

Kevin BENN, Ronald Barnes and Stanley
Parks, Defendants.

No. 77 CR 358.

United States District Court,
E. D. New York.

Nov. 25, 1977.

David G. Trager, U. S. Atty., E. D. N. Y., Brooklyn, N. Y., Richard L. Huffman, Asst. U. S. Atty., Brooklyn, N. Y. (of counsel), Ozro Thaddeus Wells, New York City, for Kevin Benn.

Martin Erdmann, Federal Defender Services Unit, The Legal Aid Society, New York City, Marion Seltzer, Brooklyn, N. Y. (of counsel), for Ronald Barnes.

Hyman J. Mendelson, Brooklyn, N. Y., for Stanley Parks.

## OPINION AND ORDER

NICKERSON, District Judge.

In this criminal case involving the federal narcotics laws, 21 U.S.C. § 841(a)(1), and conspiracy to violate them, 21 U.S.C. § 846, defendant Kevin Benn moves on Fourth Amendment grounds to suppress certain items seized from his residence in Queens, New York, and the other two defendants, Stanley Parks and Ronald Barnes, join in the motion. Benn moves also to suppress his oral statements as taken in violation of the Fifth Amendment. In addition, Barnes seeks to suppress a manila envelope seized at the time of his arrest.

The testimony at the suppression hearing showed the following pertinent facts. In April 1977, New York City police officials and special agents assigned to the Drug Enforcement Administration ("DEA") of the United States Department of Justice were conducting a narcotics investigation in Queens. On April 21, 1977 near 209th Place and 110th Avenue, Queens, DEA Special Agent Wilbur Ladson made a purchase from Parks of heroin, which Parks said he had acquired from Benn. On May 3, 1977 near Benn's then residence on 209th Place and 111th Avenue Ladson sought to buy heroin from him. Benn said that Ladson could buy ten "spoons" at $90 a piece but would have to put the money "up front" and take delivery later. No purchase was made.

On May 5, 1977 Ladson returned to Benn's residence and sought to buy five "spoons". Again Benn required the money "up front", and Ladson responded he would return later. When he did so Barnes emerged and relayed Benn's message that the money must be "up front" with delivery at an address Barnes had written on a piece of paper. Ladson refused and rang the bell to the house. When Benn came to the window he reiterated that the money must be "up front". Ladson again refused and departed.

On May 11, 1977 Ladson met once more with Parks to buy heroin. They drove to Benn's residence which Parks entered. He then came out and told Ladson that Benn had gone to another location. There Parks met with Benn then returned to the car and waited for two or three minutes until Benn signalled. Parks got out, conversed for a minute with Benn, and then told Ladson to drive to still another location. Upon arriving there Ladson gave Parks $450 with which he walked out of view and shortly returned to say they would pick up the heroin in about two hours at the same location. On Ladson's return Parks delivered the heroin.

On June 20, 1977, Ladson, Detective Richard Lehan and Special Agent Ross drove to the vicinity of 198–03 Street and 120 Avenue to arrest Benn. This was known to be Benn's new residence, he having moved in

the interim. Soon they saw Benn and Barnes come out of the building and enter a 1972 green Thunderbird, Benn in the driver's seat. With the officials following, the Thunderbird proceeded a few blocks then pulled over to the curb at 205 Street and Linden Boulevard.

As Benn got out of the car Lehan arrested him. Barnes, on the passenger side, held a small brown manila envelope which he was "attempting to put away". Although told not to move he dropped it between the right hand door and the seat. Ladson then arrested Barnes, and Ross recovered the envelope which proved to contain heroin. Benn and Barnes were placed in the rear of the government automobile and were fully advised of their constitutional rights by Lehan.

In the meantime, Detective William Kilgallon, the case agent in charge of the group, and Sergeant Kapp were several blocks away in a government automobile near Benn's residence. They were advised by radio of the arrests and drove to the arrest scene within a few minutes. Kilgallon asked Benn where the keys were to his 1976 Ford Grenada, which was to be seized for violation of Federal law. Benn replied that "his wife had the keys and it was back at his house."

Kilgallon and Kapp then drove in one government automobile back to Benn's residence. Lehan and Ross, with Benn and Barnes in custody, followed in another government vehicle. Kilgallon knocked at the door of Benn's residence and a Mr. Jupiter opened the door "fairly wide." In response to Kilgallon's question Jupiter told him that Mrs. Benn had left a short time previously. The door opened into the kitchen, and Kilgallon, while still outside the threshold, saw on top of the refrigerator, some ten feet away, several strainers of different sizes and some spoons. He walked across the threshold into the kitchen and went over to look at the strainers and spoons. He then observed underneath them a box which had stamped on it in green ink "Green Barron". Kilgallon opened the box and found it to contain empty glassine bags,

rubber bands, an ink pad, and a rubber stamp with the impression Green Barron. The packages purchased by Ladson from Parks on May 11, 1977 were similarly stamped "Green Barron" in green ink. Kilgallon seized the strainers and spoons and the box with its contents.

Kilgallon testified that he then called the United States Attorney using Benn's telephone and was advised that unless there was additional evidence in the house it would be unnecessary to obtain a search warrant. He walked out with the seized items and asked Benn, who was in custody in the government vehicle, whether there was any contraband in the house. After Benn responded that there were no narcotics but there was a gun, Kilgallon, again without a warrant, returned inside, opened the drawer Benn had identified, and seized a .22 caliber automatic weapon and $1000 in United States currency. Later Benn made incriminating statements to the officers.

■ The claim of Benn that his oral statements should be excluded is without merit. The court finds that there was probable cause to arrest him, that he was fully advised of his rights, and that his statements were knowingly and voluntarily made. Similarly, there was probable cause to arrest Barnes, and the seizure of the manila envelope which he dropped was appropriately incident to the arrest.

The only matter of substance for the court to consider is Benn's motion to suppress the evidence seized from the top of the refrigerator. The court holds that that evidence must be suppressed.

The Fourth Amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons to be seized."

■ Evidence seized in violation of the Fourth Amendment is inadmissible in evi-

dence, *McDonald v. United States*, 335 U.S. 451, 453, 69 S.Ct. 191, 93 L.Ed. 153 (1948), and the inquiry here is whether the seizure comes within the "few specifically established and well-delineated exceptions" to the basic constitutional rule that searches and seizures made without a warrant are *per se* unreasonable. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967).

■ The government, which has the burden of showing the need for an exemption from the requirement of a warrant, *Chimel v. California*, 395 U.S. 752, 762, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), does not seek to, and could not, sustain the warrantless seizure under the theory that it was incident to Benn's arrest made some blocks distant from his residence. *Chimel v. California, supra*. Rather the government contends that the items were in Kilgallon's "plain view" as he stood outside the opened door and that therefore he could cross the threshold of the residence and make the seizure.

■ It is now established that under appropriate circumstances an officer may, without a warrant, seize evidence in "plain view". *Coolidge v. New Hampshire*, 403 U.S. 443, 465, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). In that case Mr. Justice Stewart discussed at length, albeit in only a plurality opinion, the "plain view" exception, and said that in each case that allowed such a seizure the officer had "a prior justification for an intrusion" in the course of which he inadvertently (or at least without plan) saw incriminating evidence. 403 U.S. at 466, 91 S.Ct. at 2038. Under those circumstances, the Court said, the officer could seize the evidence, provided that "exigent circumstances", such as its likely disposition, required such a course. 403 U.S. at 468, 91 S.Ct. 2022.

Despite the language in the *Coolidge* case that "a prior justification" for the "intrusion" is required before a seizure may be made of evidence plainly visible, the government argues that a plain view in and of itself warrants a crossing of the threshold to seize the evidence. Neither the Supreme Court nor the Court of Appeals for the Second Circuit appears to have decided this point.

Presumably such a decision will require weighing the interest in "the right of the people to be secure" in their "houses" against the desirability of convicting those against whom evidence is patently available. Different considerations will be involved depending on the nature of evidence in view. A gun, which is palpably dangerous, or narcotics, which are capable of inflicting great injury, might weigh more heavily on the side of allowing intrusion than, for example, would the strainers and spoons found in Benn's residence, for in themselves they were not dangerous or harmful.

It may be, therefore, that the Supreme Court will decide that a plain view of evidence such as that seized here, even though we assume *arguendo* that it was in imminent likelihood of disposal, is not enough to permit a crossing of the threshold. Certainly the frequency with which the Supreme Court has reiterated the "traditional expectation of privacy" in one's residence and the "sanctity" of private dwellings, see, e. g. *United States v. Martinez-Fuerte*, 428 U.S. 543, 561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976) and cases cited; *Berger v. New York*, 388 U.S. 41, 58, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) and cases cited, suggests that as a possible result. So does the fact that the Court has left unsettled the question of whether and under what circumstances an officer may enter a suspect's home to make a warrantless arrest even though there is probable cause to do so. *United States v. Watson*, 423 U.S. 411, at 418 n. 6, 96 S.Ct. 820, 825, 46 L.Ed.2d 598 (1976). *Cf. United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976) (sustaining a warrantless entry into a house in "hot pursuit" of one whom the officers had probable cause to arrest).

In the Fifth Circuit it has been held that a plain view through a motel room window of the defendant and his companion in possession of narcotics paraphernalia was sufficient to justify breaking into the room, arresting the defendant, and seizing the paraphernalia. *Gil v. Beto*, 440 F.2d 666 (5th Cir. 1971). See also *United States v.*

*Shima,* 545 F.2d 1026 (5th Cir. 1977); *United States v. Johnson,* 561 F.2d 832 (D.C.Cir. 1977). But no such decision appears to have been rendered in this circuit, and this Court need not decide the issue since the evidence must be suppressed on narrower grounds.

■ Even assuming that under some circumstances it is proper to cross a threshold to seize evidence in plain view from the outside, the *Coolidge* case makes clear that seizure of such evidence may not be made unless it is "immediately apparent to the police that they have evidence before them." 403 U.S. at 466, 91 S.Ct. at 2038. The plain view exception is not one which allows an inspection of one object after another until something incriminating turns up. What Kilgallon saw from the vantage of the threshold were strainers of various sizes and spoons. He did not see the box stamped "Green Barron" until after he had entered the residence and gone over to take a look.

The question is therefore whether the strainers and spoons were immediately recognizable to Kilgallon as he looked in to be incriminating evidence. If they were not he was clearly not entitled to intrude and, of course, the box, which he did not observe from the threshold, was likewise improperly seized.

■ The question must be decided not by the mere subjective views or inarticulate hunches of the police official but by an objective standard. *Terry v. State of Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 20 L.Ed.2d 887 (1968). The government must show facts from which the official can properly conclude that what he sees before him is in fact incriminating evidence.

■ Furthermore, those objective facts must lead to a conclusion that what is "in plain view" is at least more probably than not incriminating evidence. Indeed, where for example, the police, pursuant to a warrant authorizing a search of a house for specific objects, come across some other article in plain view, there must at least be "probable cause" to believe that that article is incriminating evidence. *United States v. Clark,* 531 F.2d 928, 932 (8th Cir., 1976); *United States v. Johnson,* 541 F.2d 1311,

1316 (8th Cir., 1976); *United States v. Truitt,* 521 F.2d 1174 (6th Cir., 1975); *United States v. Blake,* 484 F.2d 50 (8th Cir., 1973); *United States v. Williams,* 385 F.Supp. 1400, 1405 (E.D.Mich., 1974).

Thus, even where the police officer is properly on the premises it is not enough that he have a mere suspicion that what he sees in plain view may be evidence. The Second Circuit opinion in *United States v. Rollins,* 522 F.2d 160, 166 (1975) cert. den. 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1976), does not establish a test less stringent than probable cause. There the passports inadvertently encountered in plain view during a search pursuant to a warrant were thought to evince by their very nature an intention to depart the jurisdiction in haste. Moreover, defendant was held to have waived his objection to their introduction in evidence.

It can be argued with some force that an even higher standard of proof than "probable cause" should be required to justify a crossing of the threshold of a house to seize mere harmless evidence in plain view to someone validly outside. The Fourth Amendment expresses the early determination of Americans that one's house is indeed one's "castle", *Sir Edward Coke, Lemayne's case,* 5 Rep. 91, and that the King with "all his forces dare not cross the threshold" of even a "ruined tenement." *William Pitt, Speech on the Excise Bill.* Indeed, the Fourth Amendment refers specifically to the right of the people to be "secure" in their "houses", and thus bespeaks the importance which was placed on the asylum of the home. There is thus something in our history about the privacy of one's house that makes one reluctant to countenance a breach of its sanctity except for the most compelling reasons. For these reasons a standard of proof even higher than probable cause may well be appropriate before an intrusion to seize mere harmless evidence in plain view is permitted.

■ But this question need not be decided now. "Probable cause" means something more than suspicion. *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). In the context

of this case it means that the inference that the strainers and spoons were being used in narcotics activities was more probable than that they were employed for legitimate purposes. Kilgallon did not have probable cause to believe that. The cooking or baking instruments were in a place where their use in the preparation of food was at least as likely as their employment in improper activities. Had they been in some other room, or had the box stamped "Green Barron" been visible from the door, we would have a different case. In this case, the presence of the articles seen from the door did not give rise to a highly probable inference that they were being used illegally. To allow an officer to intrude into a residence and to inspect them in such ambiguous circumstances on the suspicion that they might be used in the concoction of narcotics would be to do what the *Coolidge* case has condemned, namely, to invite "a general exploratory search from one object to another until something incriminating at last emerges." 403 U.S. 466, 91 S.Ct. 2038.

The items seized from Benn's residence will be suppressed.

So ordered.